# UNITED STATES *v.* TURKETTE

No. 80–808.   Argued April 27, 1981—Decided June 17, 1981

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed a dissenting statement, *post,* p. 593.

*Mark I. Levy* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Keeney, Deputy Solicitor General Frey,* and *Joel M. Gershowitz.*

*John Wall* argued the cause for respondent. With him on the brief was *Harry C. Mezer.**

JUSTICE WHITE delivered the opinion of the Court.

Chapter 96 of Title 18 of the United States Code, 18 U. S. C. §§ 1961–1968 (1976 ed. and Supp. III), entitled

---

*Briefs of *amici curiae* urging affirmance were filed by *Harvey A. Silverglate* for the Boston Bar Association et al.; and by *Barry Tarlow* for California Attorneys for Criminal Justice et al.

Racketeer Influenced and Corrupt Organizations (RICO), was added to Title 18 by Title IX of the Organized Crime Control Act of 1970, Pub. L. 91–452, 84 Stat. 941. The question in this case is whether the term "enterprise" as used in RICO encompasses both legitimate and illegitimate enterprises or is limited in application to the former. The Court of Appeals for the First Circuit held that Congress did not intend to include within the definition of "enterprise" those organizations which are exclusively criminal. 632 F. 2d 896 (1980). This position is contrary to that adopted by every other Circuit that has addressed the issue.[1] We granted certiorari to resolve this conflict. 449 U. S. 1123 (1981).

I

Count Nine of a nine-count indictment charged respondent and 12 others with conspiracy to conduct and participate in the affairs of an enterprise[2] engaged in interstate commerce

---

[1] See *United States* v. *Sutton,* 642 F. 2d 1001, 1006–1009 (CA6 1980) (en banc), cert. pending, Nos. 80–6058, 80–6137, 80–6141, 80–6147, 80–6253, 80–6254, 80–6272; *United States* v. *Errico,* 635 F. 2d 152, 155 (CA2 1980); *United States* v. *Provenzano,* 620 F. 2d 985, 992–993 (CA3), cert. denied, 449 U. S. 899 (1980); *United States* v. *Whitehead,* 618 F. 2d 523, 525, n. 1 (CA4 1980); *United States* v. *Aleman,* 609 F. 2d 298, 304–305 (CA7 1979), cert. denied, 445 U. S. 946 (1980); *United States* v. *Rone,* 598 F. 2d 564, 568–569 (CA9 1979), cert. denied, 445 U. S. 946 (1980); *United States* v. *Swiderski,* 193 U. S. App. D. C. 92, 94–95, 593 F. 2d 1246, 1248–1249 (1978), cert. denied, 441 U. S. 933 (1979); *United States* v. *Elliott,* 571 F. 2d 880, 896–898 (CA5), cert. denied, 439 U. S. 953 (1978). See also *United States* v. *Anderson,* 626 F. 2d 1358, 1372 (CA8 1980), cert. denied, 450 U. S. 912 (1981). But see *United States* v. *Sutton,* 605 F. 2d 260, 264–270 (CA6 1979), vacated, 642 F. 2d 1001 (1980); *United States* v. *Rone, supra,* at 573 (Ely, J., dissenting); *United States* v. *Altese,* 542 F. 2d 104, 107 (CA2 1976) (Van Graafeiland, J., dissenting), cert. denied, 429 U. S. 1039 (1977).

[2] Title 18 U. S. C. § 1961 (4) provides:

" 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

through a pattern of racketeering activities, in violation of 18 U. S. C. § 1962 (d).[3] The indictment described the enterprise as "a group of individuals associated in fact for the purpose of illegally trafficking in narcotics and other dangerous drugs, committing arsons, utilizing the United States mails to defraud insurance companies, bribing and attempting to bribe local police officers, and corruptly influencing and attempting to corruptly influence the outcome of state court proceedings . . . ." The other eight counts of the indictment charged the commission of various substantive criminal acts by those engaged in and associated with the criminal enterprise, including possession with intent to distribute and distribution of controlled substances, and several counts of insurance fraud by arson and other means. The common thread to all counts was respondent's alleged leadership of this criminal organization through which he orchestrated and participated in the commission of the various crimes delineated in the RICO count or charged in the eight preceding counts.

After a 6-week jury trial, in which the evidence focused upon both the professional nature of this organization and the execution of a number of distinct criminal acts, respondent was convicted on all nine counts. He was sentenced to a term of 20 years on the substantive counts, as well as a 2-year special parole term on the drug count. On the RICO conspiracy count he was sentenced to a 20-year concurrent term and fined $20,000.

On appeal, respondent argued that RICO was intended

---

[3] Title 18 U. S. C. § 1962 (d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Pertinent to these charges, subsection (c) provides:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

solely to protect legitimate business enterprises from infiltration by racketeers and that RICO does not make criminal the participation in an association which performs only illegal acts and which has not infiltrated or attempted to infiltrate a legitimate enterprise. The Court of Appeals agreed. We reverse.

## II

In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). Of course, there is no errorless test for identifying or recognizing "plain" or "unambiguous" language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with. *Trans Alaska Pipeline Rate Cases,* 436 U. S. 631, 643 (1978); *Commissioner* v. *Brown,* 380 U. S. 563, 571 (1965). We nevertheless begin with the language of the statute.

Section 1962 (c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961 (4). There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact. On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope; it no more ex-

cludes criminal enterprises than it does legitimate ones. Had Congress not intended to reach criminal associations, it could easily have narrowed the sweep of the definition by inserting a single word, "legitimate." But it did nothing to indicate that an enterprise consisting of a group of individuals was not covered by RICO if the purpose of the enterprise was exclusively criminal.

The Court of Appeals, however, clearly departed from and limited the statutory language. It gave several reasons for doing so, none of which is adequate. First, it relied in part on the rule of *ejusdem generis,* an aid to statutory construction problems suggesting that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated. See 2A C. Sands, Sutherland on Statutory Construction § 47.17 (4th ed. 1973). The Court of Appeals ruled that because each of the specific enterprises enumerated in § 1961 (4) is a "legitimate" one, the final catchall phrase— "any union or group of individuals associated in fact"— should also be limited to legitimate enterprises. There are at least two flaws in this reasoning. The rule of *ejusdem generis* is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute. *Harrison* v. *PPG Industries, Inc.,* 446 U. S. 578, 588 (1980); *United States* v. *Powell,* 423 U. S. 87, 91 (1975); *Gooch* v. *United States,* 297 U. S. 124, 128 (1936). Considering the language and structure of § 1961 (4), however, we not only perceive no uncertainty in the meaning to be attributed to the phrase, "any union or group of individuals associated in fact" but we are convinced for another reason that *ejusdem generis* is wholly inapplicable in this context.

Section 1961 (4) describes two categories of associations that come within the purview of the "enterprise" definition. The first encompasses organizations such as corporations and partnerships, and other "legal entities." The second covers

"any union or group of individuals associated in fact although not a legal entity." The Court of Appeals assumed that the second category was merely a more general description of the first. Having made that assumption, the court concluded that the more generalized description in the second category should be limited by the specific examples enumerated in the first. But that assumption is untenable. Each category describes a separate type of enterprise to be covered by the statute—those that are recognized as legal entities and those that are not. The latter is not a more general description of the former. The second category itself not containing any specific enumeration that is followed by a general description, *ejusdem generis* has no bearing on the meaning to be attributed to that part of § 1961 (4).[4]

A second reason offered by the Court of Appeals in support of its judgment was that giving the definition of "enterprise" its ordinary meaning would create several internal inconsistencies in the Act. With respect to § 1962 (c), it was said:

> "If 'a pattern of racketeering' can itself be an 'enterprise' for purposes of section 1962 (c), then the two phrases 'employed by or associated with any enterprise' and 'the conduct of such enterprise's affairs through [a pattern of racketeering activity]' add nothing to the meaning of the section. The words of the statute are coherent and logical only if they are read as applying to legitimate enterprises." 632 F. 2d, at 899.

---

[4] The Court of Appeals' application of *ejusdem generis* is further flawed by the assumption that "any individual, partnership, corporation, association or other legal entity" could not act totally beyond the pale of the law. The mere fact that a given enterprise is favored with a legal existence does not prevent that enterprise from proceeding along a wholly illegal course of conduct. Therefore, since legitimacy of purpose is not a universal characteristic of the specifically listed enterprises, it would be improper to engraft this characteristic upon the second category of enterprises.

This conclusion is based on a faulty premise. That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U. S. C. § 1961 (1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.[5]

Apart from § 1962 (c)'s proscription against participating in an enterprise through a pattern of racketeering activities, RICO also proscribes the investment of income derived from racketeering activity in an enterprise engaged in or which

---

[5] The Government takes the position that proof of a pattern of racketeering activity in itself would not be sufficient to establish the existence of an enterprise: "We do not suggest that any two sporadic and isolated offenses by the same actor or actors *ipso facto* constitute an 'illegitimate' enterprise; rather, the existence of the enterprise as an independent entity must also be shown." Reply Brief for United States 4. But even if that were not the case, the Court of Appeals' position on this point is of little force. Language in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent.

affects interstate commerce as well as the acquisition of an interest in or control of any such enterprise through a pattern of racketeering activity. 18 U. S. C. §§ 1962 (a) and (b).[6] The Court of Appeals concluded that these provisions of RICO should be interpreted so as to apply only to legitimate enterprises. If these two sections are so limited, the Court of Appeals held that the proscription in § 1962 (c), at issue here, must be similarly limited. Again, we do not accept the premise from which the Court of Appeals derived its conclusion. It is obvious that §§ 1962 (a) and (b) address the infiltration by organized crime of legitimate businesses, but we cannot agree that these sections were not also aimed at preventing racketeers from investing or reinvesting in wholly illegal enterprises and from acquiring through a pattern of racketeering activity wholly illegitimate enterprises such as an illegal gambling business or a loan-sharking

---

[6] Title 18 U. S. C. §§ 1962 (a) and (b) provide:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

operation. There is no inconsistency or anomaly in recognizing that § 1962 applies to both legitimate and illegitimate enterprises. Certainly the language of the statute does not warrant the Court of Appeals' conclusion to the contrary.

Similarly, the Court of Appeals noted that various civil remedies were provided by § 1964,[7] including divestiture, dissolution, reorganization, restrictions on future activities by violators of RICO, and treble damages. These remedies it thought would have utility only with respect to legitimate enterprises. As a general proposition, however, the civil remedies could be useful in eradicating organized crime from the social fabric, whether the enterprise be ostensibly legitimate or admittedly criminal. The aim is to divest the association of the fruits of its ill-gotten gains. See *infra*, at 591–593. Even if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions.[8]

---

[7] Title 18 U. S. C. §§ 1964 (a) and (c) provide:

"(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

.     .     .     .     .

"(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

[8] In discussing these civil remedies, the Senate Report on the Organized Crime Control Act of 1970 specifically referred to two state cases in which

Finally, it is urged that the interpretation of RICO to include both legitimate and illegitimate enterprises will substantially alter the balance between federal and state enforcement of criminal law. This is particularly true, so the argument goes, since included within the definition of racketeering activity are a significant number of acts made criminal under state law. 18 U. S. C. § 1961 (1) (1976 ed., Supp. III). But even assuming that the more inclusive definition of enterprise will have the effect suggested,[9] the language of the statute and its legislative history indicate that Congress was well aware that it was entering a new domain of federal involvement through the enactment of this measure. Indeed, the very purpose of the Organized Crime Control Act of 1970 was to enable the Federal Government to address a large and seemingly neglected problem. The view was that existing law, state and federal, was not adequate to address the problem, which was of national dimensions. That Congress included within the definition of racketeering activities a number of state crimes strongly indicates that RICO criminalized conduct that was also criminal under state law, at least when the requisite elements of a RICO offense are present. As the hearings and legislative debates reveal, Congress was well aware of the fear that RICO would "mov[e] large substantive areas formerly totally within the police power of

---

equitable relief had been granted against illegitimate enterprises. S. Rep. No. 91–617, p. 79, n. 9, p. 81, n. 11 (1969). These references were in the context of a discussion on the need to expand the remedies available to combat organized crime.

[9] RICO imposes no restrictions upon the criminal justice systems of the States. See 84 Stat. 947 ("Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title"). Thus, under RICO, the States remain free to exercise their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions. That some of those crimes may also constitute predicate acts of racketeering under RICO, is no restriction on the separate administration of criminal justice by the States.

the State into the Federal realm." 116 Cong. Rec. 35217 (1970) (remarks of Rep. Eckhardt). See also *id.,* at 35205 (remarks of Rep. Mikva); *id.,* at 35213 (comments of the American Civil Liberties Union); Hearings on Organized Crime Control before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 329, 370 (1970) (statement of Sheldon H. Eisen on behalf of the Association of the Bar of the City of New York). In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing that it would alter somewhat the role of the Federal Government in the war against organized crime and that the alteration would entail prosecutions involving acts of racketeering that are also crimes under state law. There is no argument that Congress acted beyond its power in so doing. That being the case, the courts are without authority to restrict the application of the statute. See *United States* v. *Culbert,* 435 U. S. 371, 379–380 (1978).

Contrary to the judgment below, neither the language nor structure of RICO limits its application to legitimate "enterprises." Applying it also to criminal organizations does not render any portion of the statute superfluous nor does it create any structural incongruities within the framework of the Act. The result is neither absurd nor surprising. On the contrary, insulating the wholly criminal enterprise from prosecution under RICO is the more incongruous position.

Section 904 (a) of RICO, 84 Stat. 947, directs that "[t]he provisions of this Title shall be liberally construed to effectuate its remedial purposes." With or without this admonition, we could not agree with the Court of Appeals that illegitimate enterprises should be excluded from coverage. We are also quite sure that nothing in the legislative history of RICO requires a contrary conclusion.[10]

---

[10] We find no occasion to apply the rule of lenity to this statute. "[T]hat 'rule,' as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one. . . . The rule comes into operation at the end of the process of

## III

The statement of findings that prefaces the Organized Crime Control Act of 1970 reveals the pervasiveness of the problem that Congress was addressing by this enactment:

"The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues

construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan* v. *United States,* 364 U. S. 587, 596 (1961) (footnote omitted). There being no ambiguity in the RICO provisions at issue here, the rule of lenity does not come into play. See *United States* v. *Moore,* 423 U. S. 122, 145 (1975), quoting *United States* v. *Brown,* 333 U. S. 18, 25–26 (1948) (" 'The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose. . . . Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers' "); see also *Lewis* v. *United States,* 445 U. S. 55, 60–61 (1980).

to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact." 84 Stat. 922–923.

In light of the above findings, it was the declared purpose of Congress "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *Id.*, at 923.[11] The various Titles of the Act provide the tools through which this goal is to be accomplished. Only three of those Titles create substantive offenses, Title VIII, which is directed at illegal gambling operations, Title IX, at issue here, and Title XI, which addresses the importation, distribution, and storage of explosive materials. The other Titles provide various procedural and remedial devices to aid in the prosecution and incarceration of persons involved in organized crime.

Considering this statement of the Act's broad purposes, the construction of RICO suggested by respondent and the court below is unacceptable. Whole areas of organized criminal activity would be placed beyond the substantive reach of the enactment. For example, associations of persons engaged solely in "loan sharking, the theft and fencing of prop-

---

[11] See also 116 Cong. Rec. 602 (1970) (remarks of Sen. Yarborough) ("a full scale attack on organized crime"); *id.*, at 819 (remarks of Sen. Scott) ("purpose is to eradicate organized crime in the United States"); *id.*, at 35199 (remarks of Rep. Rodino) ("a truly full-scale commitment to destroy the insidious power of organized crime groups"); *id.*, at 35300 (remarks of Rep. Mayne) (organized crime "must be sternly and irrevocably eradicated").

erty, the importation and distribution of narcotics and other dangerous drugs," *id.*, at 922–923, would be immune from prosecution under RICO so long as the association did not deviate from the criminal path. Yet these are among the very crimes that Congress specifically found to be typical of the crimes committed by persons involved in organized crime, see 18 U. S. C. § 1961 (1) (1976 ed., Supp. III), and as a major source of revenue and power for such organizations. See Hearings on S. 30 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 1–2 (1969).[12] Along these same lines, Senator McClellan, the principal sponsor of the bill, gave two examples of types of problems RICO was designed to address. Neither is consistent with the view that substantive offenses under RICO would be limited to legitimate enterprises: "Organized criminals, too, have flooded the market with cheap reproductions of hit records and affixed counterfeit popular labels. They are heavily engaged in the illicit prescription drug industry." 116 Cong. Rec. 592 (1970). In view of the purposes and goals of the Act, as well as the language of the statute, we are unpersuaded that Congress nevertheless confined the reach of the law to only narrow aspects of organized crime, and, in particular, under RICO, *only* the infiltration of legitimate business.

---

[12] See also *id.*, at 601 (remarks of Sen. Hruska); *id.*, at 606–607 (remarks of Sen. Byrd); *id.*, at 819 (remarks of Sen. Scott); *id.*, at 962 (remarks of Sen. Murphy); *id.*, at 970 (remarks of Sen. Bible); *id.*, at 18913, 18937 (remarks of Sen. McClellan); *id.*, at 35199 (remarks of Rep. Rodino); *id.*, at 35216 (remarks of Rep. McDade); *id.*, at 35300 (remarks of Rep. Mayne); *id.*, at 35312 (remarks of Rep. Brock); *id.*, at 35319 (remarks of Rep. Anderson of California); *id.*, at 35326 (remarks of Rep. Vanik); *id.*, at 35328 (remarks of Rep. Meskill); Hearings on S. 30 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 108 (1969) (statement of Attorney General Mitchell); H. R. Rep. No. 1574, 90th Cong., 2d Sess., 5 (1968).

This is not to gainsay that the legislative history forcefully supports the view that the major purpose of Title IX is to address the infiltration of legitimate business by organized crime. The point is made time and again during the debates and in the hearings before the House and Senate.[13] But none of these statements requires the negative inference that Title IX did not reach the activities of enterprises organized and existing for criminal purposes. See *United States* v. *Naftalin*, 441 U. S. 768, 774–775 (1979); *United States* v. *Culbert*, 435 U. S., at 377.

On the contrary, these statements are in full accord with the proposition that RICO is equally applicable to a criminal enterprise that has no legitimate dimension or has yet to acquire one. Accepting that the primary purpose of RICO is to cope with the infiltration of legitimate businesses, applying the statute in accordance with its terms, so as to reach criminal enterprises, would seek to deal with the problem at its very source. Supporters of the bill recognized that organized crime uses its primary sources of revenue and power— illegal gambling, loan sharking and illicit drug distribution— as a springboard into the sphere of legitimate enterprise. Hearings on S. 30, *supra*, at 1–2. The Senate Report stated:

"What is needed here, the committee believes, are new approaches that will deal not only with individuals, but also with the economic base through which those individ-

---

[13] 116 Cong. Rec. 591 (1970) (remarks of Sen. McClellan) ("title IX is aimed at removing organized crime from our legitimate organizations"); *id.*, at 602 (remarks of Sen. Hruska) ("Title IX of this act is designed to remove the influence of organized crime from legitimate business by attacking its property interests and by removing its members from control of legitimate businesses which have been acquired or operated by unlawful racketeering methods"); *id.*, at 607 (remarks of Sen. Byrd) ("alarming expansion into the field of legitimate business"); *id.*, at 953 (remarks of Sen. Thurmond) ("racketeers . . . gaining inroads into legitimate business"); *id.*, at 845 (remarks of Sen. Kennedy) ("title IX . . . may provide us with new tools to prevent organized crime from taking over legitimate businesses and activities"); S. Rep. No. 91–617, p. 76 (1969).

uals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on *their source of economic power itself,* and the attack must take place on all available fronts." S. Rep. No. 91–617, p. 79 (1969) (emphasis supplied).

Senator Byrd explained in debate on the floor, that "loan sharking paves the way for organized criminals to gain access to and eventually take over the control of thousands of legitimate businesses." 116 Cong. Rec. 606 (1970). Senator Hruska declared that "the combination of criminal and civil penalties in this title offers an extraordinary potential for striking a mortal blow against the property interests of organized crime." *Id.,* at 602.[14] Undoubtedly, the infiltration

---

[14] See also, *e. g.,* 115 Cong. Rec. 827 (1969) (remarks of Sen. McClellan) ("Organized crime . . . uses its ill-gotten gains . . . to infiltrate and secure control of legitimate business and labor union activities"); 116 Cong. Rec. 591 (1970) (remarks of Sen. McClellan) ("illegally gained revenue also makes it possible for organized crime to infiltrate and pollute legitimate business"); *id.,* at 603 (remarks of Sen. Yarborough) ("[RICO] is designed to root out the influence of organized crime in legitimate business, into which billions of dollars of illegally obtained money is channeled"); *id.,* at 606 (remarks of Sen. Byrd) ("loan sharking paves the way for organized criminals to gain access to and eventually take over the control of thousands of legitimate businesses"); *id.,* at 35193 (remarks of Rep. Poff) ("[T]itle IX . . . will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself . . ."); S. Rep. No. 91–617, *supra,* at 78–80; H. R. Rep. No. 1574, *supra,* at 5 ("The President's Crime Commission found that the greatest menace that organized crime presents is its ability through the accumulation of illegal gains to infiltrate into legitimate business and labor unions"); Hearings on Organized Crime Control before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 170 (1970) (Department of Justice Comments) ("Title IX is designed to inhibit the infiltration of legitimate business by organized crime, and, like the previous title, *to reach the criminal syndicates' major sources of revenue*") (emphasis supplied).

of legitimate businesses was of great concern, but the means provided to prevent that infiltration plainly included striking at the source of the problem. As Representative Poff, a manager of the bill in the House, stated: "[T]itle IX . . . will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself . . . ." *Id.*, at 35193.

As a measure to deal with the infiltration of legitimate businesses by organized crime, RICO was both preventive and remedial. Respondent's view would ignore the preventive function of the statute. If Congress had intended the more circumscribed approach espoused by the Court of Appeals, there would have been some positive sign that the law was not to reach organized criminal activities that give rise to the concerns about infiltration. The language of the statute, however—the most reliable evidence of its intent—reveals that Congress opted for a far broader definition of the word "enterprise," and we are unconvinced by anything in the legislative history that this definition should be given less than its full effect.

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE STEWART agrees with the reasoning and conclusion of the Court of Appeals as to the meaning of the term "enterprise" in this statute. See 632 F. 2d 896. Accordingly, he respectfully dissents.