UNITED STATES of America, Plaintiff,

v.

George I. BENNY, et al., Defendants.

No. CR–82–0620 RFP.

United States District Court,
N.D. California.

Feb. 23, 1983.

Robert Feldman, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Richard Jaeger, Feldman, Waldman & Kline, and Ephraim Margolin, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### I. STATEMENT OF FACTS

The indictment in this case alleges three mail fraud schemes, four perjury violations, three tax violations, and a racketeering charge.

#### A. Scheme One

The first scheme is set forth in count one of the indictment, which alleges that: In 1977, defendant George I. Benny devised a scheme to defraud Wells Fargo Bank in connection with the purchase of Diamond Heights Village. Benny represented to Wells Fargo that he was purchasing DHV for $14.5 million and that he had placed a $2 million down payment in escrow, when, instead, the purchase price of DHV was $12.5 million and the $2 million check was written against insufficient funds. Neither Benny nor the escrow company notified Wells Fargo when the check was dishonored. On the basis of Benny's representations, Wells Fargo loaned Benny $13.5 million to buy DHV in November of 1977.

#### B. Scheme Two

Counts two through nineteen set forth the second scheme as follows: In late 1979, the defendants Benny, Ariel Basse, James A. Fagerhaugh, James S. Urbanski and Robert M. Lawrence implemented a second scheme. They procured purported borrowers to submit loan applications to various lenders for the purported purchase of individual condominiums at DHV. Benny agreed to pay the downpayments into escrow and to make the monthly payments on the loans. Benny received the loan proceeds but kept the units.

The "straw sales" continued into 1981. During the course of the scheme, the defendants falsified financial information with respect to many of the purported borrowers to cause them to appear financially qualified for the loans, e.g., employment verifications and other documents reflecting income and assets. Many purported borrowers had multiple loans on DHV units which were concealed from the lenders. Furthermore, the defendants forged the names of purported borrowers on various documents.

Finally, the defendants inflated the purchase prices of the DHV units in order to obtain larger loans than otherwise would have been available. Since the "straw sales" involved no actual arm's length negotiations, Benny himself set the sales prices at levels which far exceeded the actual market value of the units. Believing these sales prices to be the result of arm's length transactions, appraisers for lenders and mortgage brokers relied upon them to determine the value of the units on which new loans were being sought, resulting in inflated appraisals. Consequently, banks and mortgage brokers made loans on the units in excess of the actual market value of the units.

#### C. The Third Scheme

The indictment alleges that the third scheme was perpetrated as follows: counts twenty through twenty-four assert that in December of 1980, Benny acquired a 160 unit condominium complex in Las Vegas known as the Casablanca condominium project. Shortly thereafter, Benny sought financing to enable him to purchase the 2300-acre Double Diamond Ranch six miles outside of Reno, Nevada, on which he intended to build a planned community. To finance the purchase of Double Diamond, Benny borrowed approximately $13 million from Nevada National Bank and other lenders. These loans were to be repaid through the sales of condominium units at Casablanca.

Instead, the defendants procured "straw" borrowers to apply for loans. Again, Benny agreed to make the downpayments and the monthly repayments of the loans. The purported borrowers executed quitclaim deeds to Benny. Thus, the Casablanca loans were

used by Benny to repay the short-term loan from Nevada National. As in scheme two, the defendants falsified the financial information pertaining to the purported borrowers and forged numerous documents involved in the Casablanca loan applications. Defendants Lawrence and Fagerhaugh are not named in this scheme.

### D. *Income Tax and Perjury*

Defendant Fagerhaugh was an escrow officer at Chicago Title Insurance Company. The government alleges that Benny compensated Fagerhaugh for the latter's participation in the scheme by purchasing him a home and by repaying Fagerhaugh's loans. These fruits of the scheme are the items of income which were allegedly unreported on Fagerhaugh's income tax returns.

Fagerhaugh's alleged perjury relates to his participation in the scheme as a straw borrower. The indictment states that Fagerhaugh lied under oath in a deposition concerning the number and nature of his "straw purchases" of DHV condominiums.

### E. *Racketeering Charge*

The racketeering charge incorporates by reference the mail fraud counts and requires proof of at least two such counts. Defendant Lawrence is not named in this count.

## II. DISCUSSION

Defendants have brought numerous motions to sever counts/defendants and motions to dismiss the mail fraud, perjury and RICO counts. We discuss only the RICO count in the present order; we have addressed the remaining motions in separate orders.

Defendant Benny brings this motion to dismiss count thirty-two of the indictment (the RICO count) for failure to charge an offense and for violation of the double jeopardy clause of the fifth amendment. As previously indicated, the indictment alleges that Benny and several of the other defendants induced lenders to finance two large land development projects and to disburse to the defendants funds to which the de-

fendants were not entitled. On the basis of the above, Benny, Basse, Urbanski, and Fagerhaugh are charged with having violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* and the mail fraud statute, 18 U.S.C. § 1341. Benny contends that the Act does not contemplate, nor the constitution allow, an identification of the defendant and the "enterprise" element of the Act. That is, he asserts that a single entity or person cannot be both the defendant *and* the "enterprise."

### A. *Failure to State an Offense*

■ Enacted as Title IX of the Organized Crime Control Act of 1970, RICO constituted "a full scale attack on organized crime," 116 Cong.Rec. 819 (1970) (remarks of Sen. Yarborough); its major purpose was "to address the infiltration of legitimate business by organized crime." *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981). RICO consists of a complex panoply of criminal and civil provisions, with criminal penalties, the possibility of forfeiture of illicit gains, and civil remedies for the victims of racketeering. The defendants are charged with a violation of section 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1962(c) encompasses several key terms. A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "pattern of racketeering ac-

tivity" "requires at least two acts of racketeering ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering" is defined as any of several broad categories of crimes, of which mail fraud is one. 18 U.S.C. § 1961(1).

The proponents and drafters of RICO did not intend to visit overly harsh and unwarranted penalties on "ordinary criminals." The target of Title IX is not "sporadic activity." *Report of the Senate Judiciary Committee on S.30,* S.Rep. 91–617, 91st Cong., 1st Sess., p. 158. However, the term "organized crime" was too vague and ill-defined to provide a meaningful criterion. *United States v. Campanale,* 518 F.2d 352, 363–64 (9th Cir.1978). Hence, the terms "pattern of racketeering" and "enterprise" serve to circumscribe the reach of the Act, providing the "factor of continuity plus relationship which combines to produce a pattern." *Rep.Sen.Jud.Comm., supra.*

However, the majority of courts which have dealt with the Act have held that a "pattern of racketeering" may be established by proof of two *unrelated* predicate acts. *United States v. Welch,* 656 F.2d 1039, 1060–62 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Thus, the only meaningful restraint upon the scope of the Act lies in the "enterprise" element; that element must be specifically proven.

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity" .... While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate

element which must be proved by the Government.

*Turkette, supra,* at 583, 101 S.Ct. at 2528.

A RICO count must therefore be more than the sum of its predicate acts (the "pattern of racketeering"). The government must also prove the "enterprise" element. Furthermore, numerous courts have held that, although the predicate acts need not be related to one another, they must be related to the conduct of the affairs of the enterprise.

> [T]he Act does not criminalize either associating with an enterprise or engaging in a pattern of racketeering activity standing alone. The gravamen of the offense described in 18 U.S.C. § 1962(c) is the conduct of an enterprise's affairs through a pattern of racketeering activity. Thus, the Act does require a type of relatedness: the two or more predicate crimes must be related to the affairs of the enterprise but need not otherwise be related to each other.

*United States v. Elliott,* 571 F.2d 880, 899 n. 23 (5th Cir.1978), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). *See also United States v. Martino,* 648 F.2d 367, 403 (9th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *United States v. Bright,* 630 F.2d 804, 830 n. 47 (5th Cir.1980); *United States v. Weisman,* 624 F.2d 1118, 1122 n. 3 (2d Cir.1980), *cert. denied,* 444 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1981). Hence the "enterprise" element has become the exclusive source of "relationship plus continuity." The enterprise element is now the "focal point of the offense." *United States v. Anderson,* 626 F.2d 1358, 1367 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

Defendant contends that, if the person charged as the defendant can also be identified as the enterprise, this last source of continuity and restraint will be erased. Benny argues that every defendant whose activities can be said to affect interstate commerce will also qualify as an enterprise. Thus, he insists, unless the enterprise element is construed to require proof of some

structure separate and distinct from the defendant, the Act simply punishes the commission of any two of the specified crimes within a ten year period, whether or not connected to any ongoing activity or conducted in association with any other person. He avers that Congress did not intend such a result.

Defendant concedes, as he must, that an individual person may constitute an "enterprise" and that an individual is, of course, a "person" who can be charged as a defendant for the offenses of § 1962. But, he asserts, the same individual cannot be *both* the defendant *and* the enterprise. This principle, he contends, is required by the language of § 1962(c), which contemplates, he avers, at least two entities: the person who must be "employed by or associated with" the enterprise or who must "conduct or participate" in the enterprise's affairs and the enterprise itself.

In support of his position, defendant relies upon *United States v. Computer Sciences Corp.,* 689 F.2d 1181 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 753 (1983), wherein the court held that a corporate defendant could not also be the named enterprise.

> "[E]nterprise" was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit and failing that, to punish .... [W]e would not take seriously, in the absence, at least, of very explicit statutory language, an assertion that a defendant could conspire with his right arm which held, aimed and fired the fatal weapon.

*Id.* at 1190.

However, *Computer Sciences'* analogy is flawed; RICO does not require proof of a conspiratorial agreement nor of associational activity. The "explicit statutory language" *does* assert that an individual may constitute an enterprise and that any person may violate § 1962(c). Moreover, the court improperly applied the rule of lenity in analyzing the racketeering statute. Section 904(a), 84 Stat. 947, directs that the statute be "liberally construed to effectuate

its remedial purposes." The Supreme Court in *Turkette, supra,* found "no occasion" to apply the rule of lenity to sections 1961(4) and 1962(c) of RICO. *Id.* at 587 n. 10, 101 S.Ct. at 2531 n. 10. We do concur with *Computer Sciences* to the extent of its holding that the government must prove the existence of two *entities* before liability can be established. In a conspiracy prosecution, at least two individuals must form an agreement to commit an offense. Under RICO, by contrast, there need be only one individual, but he must act through an identifiable entity—in this case, through his sole proprietorship. But "entities" does not necessarily connote two or more individuals or persons. We decline to follow *Computer Sciences* this far; the court therein did not support its conclusion with rigorous or persuasive statutory interpretation or policy analysis. Similarly, we are not persuaded by those courts, in civil actions under RICO, which have held that the statute requires the enterprise to be an entity separate from, and not identifiable with, the person who is alleged to have associated with it. *See Bennett v. Berg,* 685 F.2d 1053, 1961 (8th Cir.1982); *Parnes v. Heinhold Commodities, Inc.,* 548 F.Supp. 20, 23–24 (N.D. Ill.1982); *Bays v. Hunter Savings Assoc.,* 539 F.Supp. 1020, 1024 (S.D.Ohio 1982).

The argument against identification of defendant and enterprise might be viable where a corporate defendant is involved. In such a situation, the government remains able to prosecute the culpable individuals—agents, officers and employees—associated with the corporate enterprise. However, if an individual defendant/enterprise cannot be prosecuted, he entirely escapes responsibility under RICO. Nothing in the statute implies that an individual defendant, whose affairs constitute the enterprise, should automatically be immune from prosecution under RICO. Although the defendant insists that he does not seek "automatic" immunity, such immunity would surely be the logical and inevitable result of his position. It may be true, *arguendo,* that Congress did not primarily intend to reach the "lone racketeer" when it enacted RICO; yet, it

did clearly specify that such a single individual could be prosecuted if he conducted an enterprise through racketeering activities. And where "the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Albernaz v. United States,* 450 U.S. 333, 336, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). *See also United States v. LeFaivre,* 507 F.2d 1288, 1295 (4th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

The Supreme Court has broadly construed the "enterprise" element, explicitly in accordance with section 904(a). *Turkette, supra* (encompasses legitimate as well as illegitimate businesses). In the instant case, we conclude that Benny has associated with an enterprise, that is, the business of the acquisition and management of real estate. We agree that it would both violate the language and frustrate the goals of RICO to suggest that an individual cannot be associated with his own business affairs. The reality and identifiability of defendant's business affairs are sufficiently evidenced, for purposes of this motion, by Benny's financial statement of June 30, 1981 (exhibit A) and by Benny's answers to interrogatories (exhibit B), in which he stated that he operated his business affairs as a sole proprietorship. The financial statement indicates that he owned real estate estimated to have been worth $193 million. Clearly, an individual would have to have been "in the business" of acquiring real estate over some period of time in order to have amassed such assets. Benny should not escape prosecution under RICO merely because he did not incorporate his business affairs. And yet, if Benny's position were to prevail, he alone would escape prosecution; his codefendants would still face RICO charges. Hence, the person whose business was at the core of the racketeering activity would be immunized, while those persons who worked for the enterprise could be prosecuted. Surely Congress could not have intended such an absurd and unjust result.

Defendant argues that the government could have alleged an association-in-fact enterprise consisting of the defendants and, instead, is attempting to extend the purview of RICO by defining the enterprise as Benny's business affairs. Perhaps the government could indeed have defined the enterprise differently in this case. However, we are persuaded that Congress intended to permit an enterprise to be alleged in either manner. The statute permits both alternatives, assumedly to allow the government to prosecute in a situation where an individual maintains a coherent business organization but where the element of mutual association, evidently necessary to establish association in fact, cannot be proven. We therefore refuse to penalize the government for attempting to characterize the enterprise accurately. *See United States v. Hartley,* 678 F.2d 961, 989 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).

The Eleventh Circuit is in accord with our conclusion. In *United States v. Hartley, supra,* the court determined that a defendant could occupy a dual role as both enterprise and defendant. The corporate defendant had contended that it could not serve as both simultaneously; the court rejected the argument. In reaching this conclusion, the court relied upon the "broad reading given the term 'enterprise' in *Turkette,* the Court's willingness to expand the scope of RICO's application" and the absence of any statutory prohibition against the defendant's assuming a dual role. *Id.* at 988. The *Hartley* court accepted the government's hypothesis that:

> [I]f an individual were named as an enterprise, [footnote omitted] and a group of persons engaged in a pattern of racketeering with that individual, it would defy reason to suggest that the central figure (the enterprise) could not also be prosecuted under RICO.

*Id.* at 989. The court further reasoned that the corporate veil could be "pierced" to reveal an association of persons "working as a unit to effectuate a common purpose." *Id.* Hence, the court determined that its ruling would not nullify the separateness of

the enterprise element. The government would be obliged to provide "[e]vidence of its ongoing nature, and 'that the various associates function as a continuing unit.'" *Id.* Similarly, in the instant case, the government must prove that Benny was engaged in an identifiable, coherent business and conducted its affairs through a pattern of racketeering. *See also United States v. Elliott, supra,* wherein the court recognized:

> The number of persons making up an enterprise is irrelevant, however, in that even a single individual may be considered an "enterprise" under the statutory definition. [citation]. Thus, under the facts of this case, we could view [the principal defendant] as the enterprise and the other defendants as persons merely "employed or associated with" the enterprise. [citation].

*Id.* at 898 n. 18; *United States v. Joseph,* 526 F.Supp. 504, 507 (E.D.Pa.1981) (defendant Clerk of the Court could associate with enterprise alleged to be the "Clerk of the Court").\*

---

\* The Ninth Circuit appears to concur with this position. In *United States v. Ohlson,* 552 F.2d 1347, 1349 (9th Cir.1977), the defendants had argued that Wharton's Rule precluded their conviction under both RICO and a general conspiracy statute. Wharton's Rule creates a limited exception to the rule that a conspiracy to commit a substantive offense and the substantive offense itself can constitute separate offenses. *Id.* at 1349. The Rule applies only if the substantive offense requires the participation of two persons. The court in *Ohlson* rejected the argument, stating:

> The plain language of 18 U.S.C. § 1962(c) ... clearly imports that a violation may be committed by an individual acting alone .... Neither the definition of "pattern of racketeering" nor of "racketeering activity" incorporates any element of agreement or concerted activity. See 18 U.S.C. § 1961(1).

*Id.* The holding of *Ohlson* was reaffirmed in *United States v. Rone,* 598 F.2d 564, 570 (9th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), wherein two defendants were convicted of both conspiring to racketeer and racketeering itself. The defendants again argued that Wharton's Rule barred their dual prosecution because at least two persons were required to violate section 1962(c)—the person associated with the enterprise and the enterprise itself. Again rejecting the contention, the court emphasized:

To illustrate the logic of this position, we employ three hypotheticals composed by the government:

> Hypo A: Jones murders his wife in New York, robs a bank in Kentucky, and sells one ounce of marijuana in Florida.

None of these activities is related to any other or to any of Jones' other affairs. Thus, Jones has not violated RICO; he has not participated in the conduct of any "enterprise's affairs through the pattern of racketeering activity."

> Hypo B: Jones devises a plan to take control of a shopping center. Acting alone, he extorts money from three shopowners, murders a fourth shopowner and burns down a fifth shopowner's store. In addition, Jones rents an office from which he operates a security service and begins to operate several of the stores he has taken over.

Here, allegedly, the defendant's activities are the affairs of an enterprise, *i.e.,* to take control of the shopping center. We cannot believe that Congress intended such a per-

> [T]he explicit holding of *Ohlson* [was] that only one *person* is required for a violation of § 1962(c). In addition, that person must be associated with an enterprise, but the criminal activity proscribed in (c) is not the enterprise or the association but the pattern of racketeering, which can be the act of one person. The enterprise is simply one of the jurisdictional elements of the statute.

*Id.* at 570 (emphasis in original). We acknowledge that the Ninth Circuit in *Rone* further noted that: "Once the enterprise was formed, either one or the other, acting alone, could have committed acts which would constitute a violation of § 1962(c)." *Id.* Thus, the court might have intended to suggest that the "enterprise" must be composed of one or more individuals in addition to the defendant; then any individual associated with that enterprise could subsequently violate RICO. However, we reiterate that an individual may be an enterprise. Thus, applying *Rone* and *Ohlson,* once an individual constructs an ascertainable enterprise, that individual may conduct the enterprise through a pattern of racketeering, in violation of RICO. *Rone* and *Ohlson* are not to the contrary. Moreover, *Rone* explicitly recognized with favor that "[b]road and unrestricted use of the term 'enterprise' appears throughout Title IX." *Id.* at 568.

son to be immunized for his acts of racketeering merely because his status is that of a lone racketeer.

> Hypo C: All the facts are the same as in B, except that the individual incorporates under the name Security Services, Inc.

In this case, the individual could be prosecuted under RICO as a person associated with the enterprise corporation. Surely Congress could not have intended to produce different results in hypotheticals B and C. The simple fact that Benny may have operated his enterprise as a sole proprietor, rather than as a corporation, does not alter the reality that he was associated with an extensive real estate enterprise valued at almost $200 million and that he, along with others, allegedly conducted its affairs through a series of predicate crimes. Defendant's contentions notwithstanding, such an enterprise does constitute more than a stream of conduct. Rather, it fully satisfies the spirit of § 1961(4); we cannot imagine how an individual could constitute an enterprise, except through an unincorporated but ongoing, coherent plan of action which has a discrete, articulable goal. Benny's business affairs seem to satisfy this test.

Defendant asserts further that the indictment itself does not properly allege the enterprise element, but instead describes Benny himself as the enterprise:

> At all times material hereto and continuing through the present, George I. Benny has been an enterprise as that term is defined in Title 18, United States Code, § 1962(c).

> The enterprise George I. Benny has been in the business of the acquisition and management of real estate.

This language, he insists, does not allege that the enterprise *is* the defendant's real estate business, but suggests that the enterprise engages, *inter alia,* in the real estate business. The indictment might have been more explicit, but we are nonetheless persuaded that it may be reasonably construed to allege the government's enterprise theory.

Finally, defendant urges that if the court should hold that an individual's affairs may constitute an enterprise, without regard to whether those affairs amount to a legal entity or are somehow related to the affairs of others so that there exists an association in fact, there will remain no principled means by which to distinguish between the lone defendant who commits unrelated acts of racketeering and the defendant who allegedly commits those same acts through his business affairs/enterprise. The task of line-drawing will become intractable, defendant insists, and the government will effectively be afforded complete discretion to create a RICO offense from any two unrelated substantive crimes committed by a single defendant.

We readily acknowledge that the task of line-drawing will require judicial sensitivity and astuteness. The courts must be ever alert to ensure that the government has indeed produced evidence sufficient to demonstrate the existence of an ongoing business plan, without which a RICO prosecution will fail. However, this responsibility is not an unfamiliar one. Each day, the courts are called upon to apply ambitious statutory concepts in a manner which properly restricts their reach. We decline to restrain the purview of RICO as a matter of law in order to avoid the complexities of future applications. There will be ample opportunity to deal with the future when it is upon us.

### B. *Double Jeopardy*

The double jeopardy clause of the fifth amendment protects against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The Supreme Court stated the test for the "separateness" of offenses in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory visions, the test to be applied to determine whether there are two offenses or only

one, is whether each provision requires proof of a fact which the other does not. The Court has recently clarified its *Blockburger* decision, stating that it is merely a rule of statutory construction. *Albernaz, supra,* at 340, 101 S.Ct. at 1143. *Albernaz* emphasized that "because it serves as a means of discerning congressional purpose the rule should not be controlling where ... there is a clear indication of contrary legislative intent." *Id.* The Court then concluded with these remarks:

> "[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." [citation]. In determining the permissibility of the imposition of cumulative punishment, ... the Court [has] recognized that the "dispositive question" was whether Congress intended to authorize separate punishments for the two crimes. [citation]. This is so because the "power to define criminal offenses and to prescribe punishments to be imposed upon those found guilty of them, resides wholly with the Congress." [citation]. As we previously noted in *Brown v. Ohio* [432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)], "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." [citation]. Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution.

*Id.* at 344, 101 S.Ct. at 1145.

Congress clearly intended that the government could prosecute and convict for both the predicate offenses and the RICO violation. Hence, since we conclude that the government may prosecute a lone racket-

eer, we similarly find that such prosecution does not violate double jeopardy.

The Ninth Circuit has repeatedly held that a simultaneous prosecution for both a RICO violation and for all or some of its predicate acts does not violate double jeopardy. *United States v. DeRosa,* 670 F.2d 889, 894 (9th Cir.1982); *United States v. Solano,* 605 F.2d 1141, 1144–45 (9th Cir. 1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980); *Rone, supra,* at 571. In *Rone,* the court stated:

> There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying or predicate crimes which make up the racketeering pattern. The racketeering statutes were designed primarily as an additional tool for the prevention of racketeering activity, which consists in part of the commission of a number of other crimes. The Government is not required to make an election between seeking a conviction under RICO, or prosecuting the predicate offenses only. Such a requirement would nullify the intent and effect of the RICO prohibitions.

The court explained further:

> Congress clearly intended the Act to provide for new penal prohibitions and enhanced sanctions. If we were to accept appellants' theory that sentences imposed under RICO and those imposed for the predicate offense may not run consecutively, then Congress' purpose would be thwarted. If the RICO sentence must run concurrently with a sentence for any predicate crime, there would be no "enhanced" penalties. A conviction under RICO would, in fact, grant immunity for the offenses charged in the "pattern of racketeering." With the maximum penalties for RICO violations much less than those that might be obtained for the series of predicate crimes ..., the RICO statutes would be rarely used.

*Id.*

On the basis of the foregoing authorities, we conclude that the double jeopardy clause has not been violated in the case before us.

IT IS THEREFORE ORDERED that defendant's Motion to Dismiss count thirty-two IS HEREBY DENIED.