2001 OK CR 15

**Burlen GLENN, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–99–1436.**

Court of Criminal Appeals of Oklahoma.

May 30, 2001.

Lance Hopkins, Tahlequah, OK, Attorney for Defendant.

Rob Barris, Assistant District Attorney, Okmulgee, OK, Attorney for the State.

Stephen B. Hackett, Appellate Defense Counsel, Norman, OK, Attorney for Petitioner.

W.A. Drew Edmondson, Attorney General of Oklahoma, Kellye Bates, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellees.

### SUMMARY OPINION

CHAPEL, Judge:

¶ 1 Burlen Glenn was tried by jury and convicted of Count I, Racketeering in violation of 22 O.S.Supp.1993, § 1402; Counts II, IV, VIII, X, XII, and XIV, Knowingly Concealing Stolen Property in violation of 21 O.S.1991, § 1713; Counts III, VI, and XI, Uttering a Forged Instrument in violation of 21 O.S.1991, § 1577; Count VII, Obtaining Money by False Pretenses in violation of 21 O.S.1991, § 1541.1; and Count XVII, Larceny of Domestic Animals in violation of 21 O.S.1991, § 1716, in the District Court of Cherokee County, Case No. CF–97–115. In accordance with the jury's recommendation the Honorable G. Bruce Sewell sentenced Glenn to twenty-five (25) years imprisonment on Count I; five (5) years imprisonment on each of Counts II, IV, VIII, X, XII, XIV; seven (7) years imprisonment on each of Counts III, VI, VII, XI; and six (6) years imprisonment on Count XVII. Glenn appeals these convictions and sentences.

¶ 2 Glenn raises four propositions of error in support of his appeal:

I. The State's evidence was insufficient to prove the violation of the Oklahoma Corrupt Organizations Prevention Act;

II. The preliminary hearing magistrate did not follow proper procedure when it [sic] bound Glenn over for trial under 22 O.S.1991, § 1403(E) in derogation of his constitutional rights which guarantee trial in the county in which the crime occurred;

III. Glenn's simultaneous convictions for six counts of concealing stolen property and one count of larceny of domestic animals violated the double jeopardy clause and § 11; and

IV. The sentence imposed is excessive, in part because of prosecutorial misconduct, and should be modified.

¶ 3 After thorough consideration of the entire record before us on appeal including the original record, transcripts, briefs and exhibits of the parties, we find Proposition I requires that Count I be reversed. Along with his former wife, Christine Glenn, and Leslie "Poncho" Moody, Glenn was accused of stealing and selling cattle belonging to Mark Freeman, Jr., and C.C. Gillespie. The racketeering count also alleged Glenn and Moody tried to steal cattle from Ronnie Woodruff. The animals were stolen from ranches in Latimer County and sold at various locations in five Oklahoma counties, plus sale barns in Texas and Arkansas. Glenn and Moody penned, stole, transported and sold the animals. Christine Glenn cashed three checks, proceeds of the stolen cattle sales, for Glenn. The thefts occurred from sometime in May, 1995 through July 1995, and the attempted theft from Woodruff was in December, 1995.

¶ 4 Glenn and Moody were charged with associating with an enterprise to conduct or participate in its affairs through a pattern of racketeering activity in violation of the Oklahoma Corrupt Organization Prevention Act (RICO).[1] The State alleged the substantive crimes of concealing stolen property (selling the cattle), uttering forged instruments, obtaining money by false pretenses, and larceny of domestic animals, as predicate acts constituting a pattern of racketeering activity. Oklahoma's criminal RICO statute prohibits one from profiting through racketeering activity through the affairs of an enterprise.[2] The Oklahoma RICO statute was modeled on the federal statute. The plain language of the Oklahoma RICO statute instructs us that federal law may guide us in interpreting the statute.[3] After thoroughly considering the text of the Oklahoma statute, combined with federal case law and the avowed intent of the United States Congress in enacting the federal RICO statute, we conclude that this crime was not appropriately prosecuted under RICO.

¶ 5 RICO was designed to protect society from organized crime (associations which prey on society for profit), not from two individuals getting together to steal cattle. This policy question—the scope of RICO—is one of first impression in Oklahoma. In enacting the original federal RICO statute, Congress explicitly stated it was designed to aid in the eradication of organized crime. The preface to that Act described organized crime as: (a) a highly sophisticated, diversified, and widespread activity draining billions of dollars from the economy by unlawful conduct and the illegal use of force, fraud, and corruption; (b) deriving a major portion of its power through money obtained from illegal activities such as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of dangerous drugs, and other forms of social exploitation; (c) using this money and power to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt the democratic processes; (d) which activities weaken the stability of the country's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten domestic security, and undermine

---

**1.** 22 O.S.1991, § 1401 *et seq.*

**2.** 22 O.S.1991, § 1403.

**3.** 22 O.S.1991, § 1419.

the general welfare.[4] *United States v. Turkette*[5] noted organized crime activities could also include activities like counterfeit music industry products and illicit prescription drugs.[6] *Turkette* held that, given this broad statement, RICO should not be restricted merely to legitimate enterprises and should reach illegal enterprises organized and existing for criminal purposes.[7] This is the Supreme Court's most complete pronouncement on the appropriate scope of RICO.

■ ¶ 6 The Oklahoma RICO statute contains no preface. As it is substantially similar to the federal statute, we must assume it was intended to cover the same scope of activities.[8] We conclude that, given the serious, pervasive and highly structured nature of the activities described above, RICO simply was not intended to reach any association of individuals who engage in ordinary criminal conduct. In reaching this decision we look at the reasoning of other jurisdictions which have considered the issue. As most RICO cases involve securities or money fraud, drugs, gambling, extortion or similar large-scale "crime rings," the facts of most cases do not require courts to consider RICO's scope.

¶ 7 The Eighth Circuit has considered this question, and has concluded that RICO does not apply merely where informal groups agree to engage in conduct which might constitute racketeering activity. In *United States v. Bledsoe*[9] the Eighth Circuit determined that RICO charges were improper against a group of persons who were alleged to have formed or sold securities for several agricultural cooperatives. The Eighth Circuit initially stated that RICO was not recidivist in nature, intended to impose heavier sentences for crimes punishable under other statutes, and "was not intended to be a catch-all reaching all concerted action of two or more criminals involving two or more of the designated crimes."[10] *Bledsoe* determined that the threshold question is what type of organization constitutes an enterprise under RICO. The government argued that an enterprise could consist of any association of individuals. *Bledsoe* returned to the legislative history surrounding RICO and determined it was primarily enacted to prevent organized crime from infiltrating legitimate economic entities, noting the drafters' concerns that legitimate and illegitimate organizations were threatening the free market.[11] *Bledsoe* reviewed the Act, its legislative history, and *Turkette*, and concluded that RICO "was not intended to reach any criminals who merely associate together and perpetrate two of the specified crimes."[12] The opinion cites statements of Senator McClellan, RICO's principal sponsor, who (a) noted that the

---

4. *United States v. Turkette*, 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) quoting the preface to the Organized Crime Control Act of 1970, Pub.L. 91–452, Title IX, 901(a), Oct. 15, 1970, 84 Stat. 922–23.

5. 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). *Turkette* held an enterprise may be legal or illegal in nature.

6. 452 U.S. at 590, 101 S.Ct. at 2532.

7. 452 U.S. at 590–91, 101 S.Ct. at 2532–33.

8. *See* 22 O.S.1991, § 1419. The Oklahoma RICO Act provides that predicate occasions of conduct must have occurred within three years, as opposed to ten in the federal statute. Oklahoma's statute also includes in the definition of "enterprise" the phrase "any lawful or unlawful project or undertaking." This appears to codify the decision in *Turkette*.

9. 674 F.2d 647 (8th Cir.), *cert. denied sub nom. Phillips v. U.S.*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The United States admitted that the enterprise alleged was the persons engaging in securities fraud, not the agricultural co-ops whose securities were sold. The question on appeal was whether there was sufficient evidence of a single enterprise consisting of the individual defendants associating in fact and distinct from the co-ops.

10. *Bledsoe*, 674 F.2d at 659.

11. *Bledsoe*, 674 F.2d at 662. The opinion cites the opening statements of the Chairman of the House Subcommittee at the beginning of the hearings on the Act, which define the types of criminal activity intended to fall under RICO's scope and "to circumscribe the reach of the substantive as well as the procedural provisions." 674 P.2d at 662, n. 8 (quoting *Organized Crime Control: Hearings on S. 30, and related proposals Before the Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 2d Sess. 77 (1970)).

12. *Bledsoe*, 674 F.2d at 662.

enumerated crimes were characteristic of organized crime and (b) said an individual committing one of these crimes would not be subject to prosecution under RICO unless that person also "engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business."[13] *Bledsoe* determined that proof of an enterprise requires proof of a structured organization, because otherwise RICO could apply to most criminal cases involving more than one person or offense: "Any two criminal acts will necessarily be surrounded by some degree of organization and no two individuals will ever jointly perpetrate a crime without some degree of association apart from the commission of the crime itself."[14]

¶ 8 The Third Circuit touched on the question of RICO's scope in *United States v. Riccobene,*[15] involving widespread federal gambling and extortion violations. The Court discussed the danger that the concept of an illegal enterprise could be read too broadly, enabling the State to impose an additional penalty under RICO "whenever they had a case involving the commission of two offenses that, coincidentally, were among those listed as 'racketeering activities.'"[16] The Third Circuit appeared to determine that this danger could be avoided by *Turkette's* restrictions on the enterprise element: an ongoing organization in which associates function as a continuing unit, existing separately from the racketeering activity.[17]

¶ 9 Glenn and Moody spent about two months stealing cattle from two people in Latimer County. They transported the cattle to five Oklahoma counties as well as counties in Arkansas and Texas, and sold them in several different livestock sales. Along with Glenn's wife and daughter, they forged signatures on and cashed the checks for the sale proceeds. Several months later, Glenn and Moody tried unsuccessfully to steal more cattle from a third Latimer County rancher. Although Glenn was not arrested until May, 1997, the record shows no further allegations of cattle theft between December 1996 and May 1997.

¶ 10 The Court is satisfied that, whether out of spite or a desire for money, Glenn committed the charged substantive offenses. He and Moody are cattle thieves. The issue is whether this sort of criminal behavior—two men getting together to steal their neighbors' cattle—was what the Legislature intended to proscribe as "racketeering." Application of RICO to this case looks very much like the "overly broad" interpretation which Congress wanted to avoid in enacting the federal statute. Glenn and Moody stole and sold a lot of cattle, and got a substantial sum of money. However, they did not use this money to infiltrate, corrupt, or otherwise affect legitimate businesses or state government. Their crimes harmed their victims, but there was no larger effect on society beyond that of the normal criminal offense.

¶ 11 Glenn compares his case to the facts in *Barrett v. Tallon.*[18] There, cattle companies sued for fraud and conversion under RICO. The United States District Court for the Eastern District of Oklahoma dismissed the claims, holding the plaintiffs failed to state a claim under RICO, and imposed federal Rule 11 sanctions. The parties did not contest the RICO ruling on appeal. Regarding the sanctions, the Tenth Circuit noted that the plaintiffs failed to plead two elements of a RICO claim and stated, "[T]he district court correctly observed that the plaintiffs attempted 'to dress a garden-variety state fraud and/or conversion case in

---

13. *Bledsoe,* 674 F.2d at 663.

14. *Bledsoe,* 674 F.2d at 664.

15. 709 F.2d 214 (3rd Cir.), *cert. denied sub nom. Ciancaglini v. United States,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The Third Circuit noted in *United States v. Vastola,* 989 F.2d 1318 (3rd Circuit 1993), and subsequent cases, that *Riccobene* was overruled on other grounds by the United States Supreme Court's decision in *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (discussing evidence necessary to support conviction where multiple predicate offenses charged).

16. *Riccobene,* 709 F.2d at 221.

17. *Id.*

18. 30 F.3d 1296 (10th Cir.1994).

RICO clothing'." [19]

¶ 12 The Oklahoma legislature has not provided explicit guidance on RICO's scope, but the statutory language is instructive. RICO refers to unlawful debt, securities, interest in real and personal property, bona fide purchasers, and beneficial interests; it enumerates as racketeering offenses the kind of pecuniary and violent crimes most often associated with gangs or criminal groups (extortion, murder, bribery).[20] Like the United States Congress, the Oklahoma Legislature appears to have been concerned about the proliferation of criminal associations that prey on society on a large scale. The Oklahoma Criminal Code has ample provisions to safeguard society against regular criminals, and Glenn was successfully prosecuted for the substantive crimes he committed.

¶ 13 The State suggests the Court affirm the RICO counts by indulging a broad reading of the RICO statutes. However, such a broad reading opens up RICO prosecution to any two criminals who associate together to commit two or more occasions of conduct which might constitute a pattern of racketeering. This turns RICO into just another enhancement statute. As the Legislature has enacted several general and specific enhancement statutes, we cannot presume it intended RICO to act merely as an another enhancement for garden-variety crimes. This would require us to disregard the specific statutory language used to describe RICO violations, as well as the history and intent behind the national wave of RICO legislation. RICO was intended to apply to criminal associations which have a larger and more pernicious effect on state commerce than small-scale cattle theft. Glenn's conviction on Count I must be reversed.

¶ 14 We find in Proposition II that venue was proper in Cherokee County, and the magistrate's failure to follow the proper procedures in making this finding does not require relief.[21] We find in Proposition III that Glenn's convictions for concealing stolen property and larceny of a domestic animal did not rise from one continuous transaction, but resulted from a series of separate crimes, and violate neither the statutory prohibition against double punishment nor double jeopardy.[22] Regarding Proposition IV, we first note that Glenn's twenty-five year sentence for Count I must be vacated. We find there was no prosecutorial misconduct which could have influenced the remaining sentences, and they are not so disproportionate as to shock the Court's conscience.[23]

## DECISION

¶ 15 The Judgment and Sentence of the District Court on Count I is **REVERSED** with instructions to **DISMISS**. The Judgments and Sentences on the remaining Counts are **AFFIRMED.**

LUMPKIN, P.J., concur in part/dissent in part.

JOHNSON, V.P.J., and STRUBHAR, J., concur.

LILE, J., concur in results.

LUMPKIN, Presiding Judge, concurring in part/dissenting in part:

¶ 1 I dissent to the reversal of Count I, and to the interpretation placed on the Oklahoma Corrupt Organizations Prevention Act, 22 O.S.1991, § 1401, et seq.

¶ 2 The opinion states the Oklahoma act is similar to the federal act, therefore we must

19. Barrett, 30 F.3d at 1299.

20. 22 O.S.Supp.1993, § 1402; 22 O.S.1991, § 1403.

21. Carter v. State, 1996 OK CR 34, 922 P.2d 634, 638 640; 22 O.S.1991, § 1403(E). We note Glenn waived review of all but plain error when he failed to timely challenge the magistrate's ruling. Omalza v. State, 1995 OK CR 80, 911 P.2d 286, 294; Bales v. State, 1992 OK CR 24, 829 P.2d 998, 1000; Porter v. State, 1983 OK CR 100, 666 P.2d 784, 786.

22. 21 O.S.Supp.1999, § 11; Mooney v. State, 1999 OK CR 34, 990 P.2d 875, 883–84; United States v. Dixon, 509 U.S. 688, 704, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556 (1993).

23. Allen v. State, 1994 OK CR 13, 871 P.2d 79, 97, cert. denied, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322; Jones v. State, 1998 OK CR 36, 965 P.2d 385, 386.

assume it was intended to cover the same scope of activities. This is not a correct assumption.

¶ 3 The power to define crime and punishment in this State lies with the Oklahoma Legislature. *State v. Young*, 989 P.2d 949, 955 (Okl.Cr.1999). It is well established that statutes are to be construed according to the plain and ordinary meaning of their language. *Id.* Words not found in the text of a criminal statute will not be read into it for the purpose of extending it or giving it an interpretation in conformity with a supposed policy. *State v. Humphrey*, 620 P.2d 408, 409 (Okl.Cr.1980). The fundamental principle of statutory construction is to ascertain and give effect to the intention of the Legislature as expressed in the statute. *Young*, 989 P.2d at 955.

¶ 4 In the federal RICO act, Congress explicitly set forth the purpose of the act—to aid in the eradication of organized crime. The preface to the federal act then describes organized crime. This preface was not adopted by the Oklahoma Legislature when it enacted the Oklahoma Corrupt Organizations Prevention Act. We must conclude the Legislature intentionally omitted the federal preface and its restrictions.[1] In the absence of any legislative history, we do not know why the preface was omitted. It could have been because the Legislature did not want to restrict the state law's application to only organized crime, and wanted a broader application than the federal law. It could have been the Legislature was more concerned with the proliferation of criminal associations on the small scale rather than large scale organized crime operations. The state law as it is written gives greater authority to the state to prosecute the smaller scale criminal activity—cattle thieves, small scale drug rings, etc., which are more likely to occur in this state than large scale criminal organizations. Whatever the reason for the omission, the preface to the federal law, and its specified intent to eradicate organized crime, is not contained in the Oklahoma statute and it

is not for the judiciary to insert it. Accordingly, the federal case law cited in the opinion is not controlling authority, nor is it relevant to our decision in this case, as it is based upon an interpretation of the federal act, which has within its statutory framework an expression of federal congressional intent with its stated purpose to eradicate organized crime. The failure of the Oklahoma Legislature to enact that federal stated intent obviates the applicability of federal cases interpreting that federal intent.

¶ 5 Reading the state statute in its entirety, I find the criminal activity in this case is just what the state law was designed to cover—the prohibition of organized criminal activity, whether large or small scale, which presents great harm to local communities and which federal authorities cannot prosecute. Following federal law as precedent, rather than the language of our statute, would result in the nullification of the statute due to the small number of large scale criminal organizations in the state.

¶ 6 Accordingly, I find prosecution under the Oklahoma Corrupt Organizations Prevention Act, 22 O.S.1991, § 1401, *et seq.*, appropriate in this case, and the evidence sufficient to support a conviction.

¶ 7 This Court has previously rejected the concept of proportionality review. *See Applegate v. State*, 904 P.2d 130, 134–35 (Okl. Cr.1995); *Maxwell v. State*, 775 P.2d 818, 820 (Okl.Cr.1989). *Stare decises* dictates the same application here and the issue is whether the sentence shocks the conscience of the Court. I find it does not.

¶ 8 In *Rackley v. State*, 814 P.2d 1048 (Okl.Cr.1991), this Court stated in part:

> While we agree that Appellant's sentence is severe, it is not outside the statutory range. To be considered error, the sentence must be so greatly disproportionate that it shocks the conscience of the court. *Virgin v. State*, 792 P.2d 1186, 1188 (Okl. Cr.1990).

---

1. Because the Oklahoma Legislature did not adopt the preface contained in the federal act, there is no "language of the Oklahoma Corrupt Organizations Prevention Act [which] is the same or similar to the language of Title IX of P.L. 91- 452 as amended, ..." to which the provisions of 22 O.S.1991, § 1419 apply. Therefore, federal caselaw interpreting that federal preface is not relevant to this case.

*Id.* at 1050. While the term "disproportionate" is used in the opinion, it is clearly used as a descriptive term relating to the "shock the conscience" test and not the definition of a standard of review. The standard of review for excessive sentence used in *Rackley* is "shock the conscience" and the case does not intimate, nor even attempt to intimate, that the standard of review should be a proportionality analysis. Mere descriptive words do not form a legitimate justification for a new rule of law.

¶ 9 I therefore concur in the Court's decision to affirm the judgments and sentences in the remaining counts and would also affirm the judgment and sentence in Count I.