[Cite as *State v. Birdsong*, 2014-Ohio-1353.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-L-003** |
| EDMOND BIRDSONG, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 12 CR 000118.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Brenna Lisowski,* 2965 Yorkshire, Cleveland Heights, OH 44118 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Edmond Birdsong, appeals his conviction in the Lake County Court of Common Pleas, following a jury trial in which he was convicted of engaging in a pattern of corrupt activity and multiple counts of felony theft. Appellant argues the trial court committed plain error by not merging his predicate offenses with the offense of engaging in a pattern of corrupt activity. For the reasons that follow, we affirm.

{¶2} On February 27, 2012, appellant was charged in a ten-count indictment with engaging in a pattern of corrupt activity, a felony of the second degree; theft of blank checks, a felony of the fifth degree; and eight counts of theft by deception, felonies of the fifth degree, committed against various business establishments in Lake and Geauga Counties. Appellant pled not guilty.

{¶3} Appellant's jury trial was scheduled to begin on June 26, 2012. However, he failed to appear. The trial court ordered that a warrant be issued for his arrest. On July 15, 2012, appellant was arrested and transported to the Lake County Jail. The case proceeded to jury trial, which began on October 30, 2012.

{¶4} It was undisputed at trial that appellant and Sanders developed a plan whereby appellant would steal checks and then they would pass them at various stores in Lake and Geauga Counties to obtain merchandise. They would then either pawn the stolen goods or sell them to people known by appellant to be looking for such merchandise. Sanders and appellant would split the cash evenly and then use it to buy drugs to satisfy their drug habits.

{¶5} Raymond Reho testified that he works in Fairport Harbor. He said that, during a lunch break in the beginning of February 2011, he visited his cousin, who lives on Sixth Street in Fairport Harbor. At that time a male was staying at his cousin's house, who said his name was Michael. Reho identified this male in court as appellant.

{¶6} Reho said he had recently opened a checking account. The bank had given him five blank starter checks. The checks had his account number on them, but not his name or address. He was to fill in those items when cashing these checks. He kept them in his car and never used them. While Reho was visiting his cousin,

2

appellant went outside for a while. When Reho returned to his car to go to work, he noticed his cell phone was missing from his car.

{¶7} Reho testified that, one week later, his bank contacted him and advised that three of his stolen checks had been used, two at Lake Erie Lawn and Garden and one at a gas station, the Painesville One Stop. He testified he had never been to either location. The name "John Sanders" was written and signed on the checks. Reho said he does not know a John Sanders, and did not write, sign, or pass any of these checks. He said he never gave Sanders or anyone else permission to use them. Reho reported the theft to the Fairport Harbor Police Department.

{¶8} Dawn Eustache, cashier at the Lake Erie Lawn and Garden store in Mentor-on-the-Lake, testified that on February 15, 2011, two males came into the store and selected a chainsaw to buy. One of the males, who identified himself as John Sanders, did most of the talking, and paid for the saw using a blank check for $762. Sanders wrote in his name and address on the top left-hand corner of the check and signed the check. Ms. Eustache later learned that the check had been stolen and was refused payment.

{¶9} Robert Hall, manager of the Lake Erie Lawn and Garden store in Painesville, testified that two days later, on February 17, 2011, two males came in the store wanting to buy a chainsaw and a leaf blower. Both customers were involved in the conversation with Hall. Hall sold them a chainsaw and a leaf blower for $786. One of the males, John Sanders, used a starter check that did not have his name on it so Hall asked for two forms of identification, which Sanders provided. Sanders printed his

3

name and address on the check and signed it. Hall said a few days later, he was notified the check was refused payment.

{¶10} Wendy Carlson testified she lives at 311 Seventh Street in Fairport Harbor with her husband Chris. She said that on August 7, 2010, her purse, which contained her wallet, driver's license, and checkbook, was stolen from her car, which was parked in their driveway. She reported the theft to the Fairport Harbor Police and notified her bank. She provided the check numbers for the ten missing checks and the bank put a hold on them. She said her checking account was a joint account with her husband, and both of their names were on the checks.

{¶11} Six months later, on February 22, 2011, Ms. Carlson learned that some of her stolen checks had recently been presented for payment. She identified the checks passed in this case as having been stolen from her purse. She said she had never been to any of the stores where her checks had been passed and she did not pass any of them. She said she did not give permission to appellant, John Sanders, Christine Turcoliveri, or anyone else to use her checks.

{¶12} Chris Carlson also identified the checks that had been passed. He said that each was signed using his name, but he did not write or sign any of them. He said he had never been to any of these stores and he did not give anyone permission to use the checks.

{¶13} Officer Michael Wilson of the Fairport Harbor Police Department testified that on August 7, 2010, he met Ms. Carlson at her residence at 311 Seventh Street. She reported her car had been entered and her purse was stolen. He said that Sixth Street is the next street behind Seventh Street and that the residence at 311 Sixth

4

Street is directly behind the Carlson residence. The officer said that appellant was then living at 311 Sixth Street, which was directly behind the Carlsons' residence.

{¶14} Dan Johnson, owner of First Quality Power Place in Middlefield, Geauga County, testified that on February 22, 2011, two males came into the store and bought two chainsaws. Mr. Johnson identified appellant in court as one of the two males. Mr. Johnson said the male who identified himself as Chris Carlson paid for the saws with a check in the amount of $768. That male signed the check as Chris Carlson. Mr. Johnson asked for identification. The male purporting to be Carlson said he did not have his identification with him, but he offered his "wife" Wendy Carlson's driver's license as identification and said she was outside in the car. A few days later, Mr. Johnson learned that the male who wrote the check was not Chris Carlson and that the check was refused payment.

{¶15} Eric Artim, manager of Hemley Hardware in Montville, Geauga County, testified that on February 22, 2011, two males came into the store and bought a plasma cutter, which is used to cut steal. The two males picked out the item and came to the register together. One male claiming to be Chris Carlson wrote a check for the cutter in the amount of $1,729. The other male carried the box containing the cutter outside the store. The two males then entered a red car in the parking lot and drove away. A surveillance video captured the transaction. John Sanders testified the video showed him and appellant at the counter; Sanders writing the check; appellant carrying the cutter out of the store; both accomplices entering Sanders' girlfriend's red car; and the car driving away. A few days later, Mr. Artim was notified the check was refused payment.

**{¶16}** Brian Tornifolio of Airgas in Middlefield testified that on February 22, 2011, he was at the counter when two males came in the store. They said they were looking for a welder. Mr. Tornifolio identified appellant in court as one of the males. After looking for awhile, they purchased a welder. The male who had been doing most of the talking wrote the check for $701, signing his name as Chris Carlson.

**{¶17}** During the sale, the two males noticed a plasma cutter. "Carlson" said they would think about it and, if they decided to buy it, they would come back for it. The next day, November 23, 2011, both men returned to the store and bought the plasma cutter. At that time they also bought a welding hood. The total price for these items was $1,391, for which "Carlson" wrote a check. A few days later, Mr. Tornifolio learned both checks were refused payment.

**{¶18}** Clarence Miller, part-owner of C & R Stihl in Middlefield, testified that on February 23, 2011, two men came in the store together and bought two chainsaws. One of the men paid for the saws with a check he signed as Chris Carlson in the amount of $1,729. The two males were standing at the counter together during the purchase. A few days later, Mr. Miller received notice from their bank that the check had been refused payment. Mr. Miller sent a letter to Chris Carlson. Carlson's wife called. She said the check was stolen and gave Mr. Miller the contact information for the investigating officer.

**{¶19}** John Sanders testified that on February 23, 2011, he and appellant went to Haueter's Lawn and Sport Center in Middlefield attempting to "purchase" a generator. He said the store did not have one so they were unable to obtain it at that time. He and

6

appellant had the store manager call the Haueter's store in Chardon to see if that store had a generator for them. They said it would be in the store in a few days.

{¶20} Thomas Haueter, owner of Haueter's Lawn and Sport Center, testified that on February 26, 2011, a male entered the Chardon store alone, introduced himself as Chris Carlson, and said he was there to pick up the generator. He wrote a check for $2,128, signing his name as Chris Carlson. The generator was then loaded in his car.

{¶21} Mr. Haueter deposited the check in the company's account. Subsequently, he received notice that the check was refused payment. Mr. Haueter said he was contacted by a Geauga County Sheriff's detective a week or so later, who advised him that their generator was at Geauga Pawn in Newbury, but that he would have to pay the amount the pawnshop paid for it. Mr. Haueter paid the pawnshop $300 for his generator. He also sustained a loss of $500 from having to sell it as used.

{¶22} Christine Turcoliveri, Sanders' girlfriend, testified that she also passed one of the Carlsons' checks. She said that in February 2011, she drove appellant and Sanders to the Smoke Shop in Middlefield to buy five cartons of cigarettes. She wrote a check for over $200 for the cigarettes, using one of Wendy Carlson's checks and also using Wendy Carlson's driver's license as identification. She said that after she bought the cigarettes, appellant and Sanders sold them for cash and used the money to buy drugs, which the three of them used. She said that appellant gave her the Carlsons' checkbook and Ms. Carlson's driver's license to use as identification.

{¶23} Todd Tingler, Sanders' nephew, testified he is presently at NEOCAP following his conviction of grand theft and passing bad checks. Tingler said he passed the checks at Chardon Rental in Chardon and at Mentor Rental in Painesville shortly

7

before Sanders and appellant committed the thefts involved in this case. He said the checks he passed were from the Carlsons' account and he got them from Sanders and appellant. Tingler said he used the money he received from passing these checks to buy drugs and he then used the drugs with Sanders and appellant.

{¶24} Tom Boles, who is another nephew of Sanders and Tingler's brother, testified he is also at NEOCAP following his conviction for passing bad checks. He said the checks he used were stolen from a John Krause, and that Sanders and appellant provided the checks to him. Boles said that he, Sanders, appellant, and Christine Turcoliveri were involved in stealing checks, using them to obtain merchandise, selling it to obtain cash, and then using the money to buy drugs. He said his role was to pass bad checks to obtain merchandise from places that included Concord Rentals, Handy Rentals, and Aaron's Rentals, and then to sell the merchandise. He said he committed these crimes with them between January and March 2011. He said that Sanders and appellant asked people what they wanted and they would go to stores and get those items using stolen checks. He said that on one occasion, he got a Play Station 3 using a bad check. Sanders then took him to a house in Fairport Harbor where they picked up appellant. The three of them then sold the play station and used the money to buy drugs.

{¶25} Christine Turcoliveri testified that she is now serving time at NEOCAP following her conviction of identify fraud committed against Wendy Carlson, theft, and forgery. She said she drove appellant and Sanders to each of the stores they "hit" in her red Chevrolet Cavalier. She said this was her role in these crimes.

{¶26} Turcoliveri said that appellant stole Reho's starter checks from Reho's car. She said that after appellant stole the checks, he called Sanders and said he had some checks. She and Sanders picked him up and they started to use Reho's checks.

{¶27} Turcoliveri said she drove appellant and Sanders to the Lake Erie Lawn and Garden stores in Mentor-on-the-Lake and Painesville where they used Reho's checks. She said that appellant and Sanders "planned" to go in both stores, get specific merchandise they were looking for, and then sell it to people appellant knew. She said they sold the merchandise to one of appellant's friends in Painesville. They then went to buy drugs with the money.

{¶28} Turcoliveri testified that appellant told them he stole the Carlsons' checks from their car. Appellant and Sanders decided to use these checks at various stores in Geauga County. She drove Sanders and appellant to the stores they hit in that county. Sanders and appellant then pawned or sold the merchandise, split the money, and used it to buy drugs.

{¶29} Turcoliveri said that on February 23, 2011, she drove Sanders and appellant to Haueter's in Middlefield to buy a generator. She said they were unable to get a generator at that location so they had the manager call the Haueter's store in Chardon and ask him if they had a generator there. The Chardon manager said it would be in the store in a few days. Then, on February 26, 2011, she drove Sanders to the Chardon Haueter's and he bought the generator. Sanders and Turcoliveri then took it to a pawnshop in Geauga County and pawned it. They used the money to buy drugs. She said that, although appellant was not with them at that time, he: (1) "was involved in trying to get [the generator] ordered from the Chardon store;" (2) provided the Carlson

9

check Sanders used to buy the generator; and (3) let them keep the Carlson checkbook and Wendy's driver's license, which they used to steal the generator.

{¶30} John Sanders testified he is serving a seven-year prison sentence following his guilty plea to engaging in a pattern of corrupt activity and multiple counts of theft for his role in these crimes.

{¶31} Sanders said he has been close friends with appellant since high school, and he "loves him like a brother." He said that he, appellant, and Turcoliveri committed each of the instant crimes during the month of February 2011.

{¶32} Sanders said Turcoliveri drove him and appellant to the businesses they hit. She stayed in the car while they went inside. He said he and appellant agreed to engage in this activity and they agreed about the roles each would play. He said they agreed that appellant would provide the checks. Sanders would use the checks to buy the merchandise. Appellant would convert the merchandise into cash by selling it to people he knows or they would pawn it. They would then split the cash equally and use it to buy drugs. Sanders said he was 'obviously a co-conspirator." He said they went in each store together with the intent to "buy" something with checks they knew were stolen.

{¶33} Sanders said appellant told him he went into Reho's car and stole his checks. Sanders said he wrote his own name on the Reho checks because they were starter checks with no name or address on them. He and appellant used Reho's checks at the Lake Erie Lawn and Garden stores in Mentor-on-the-Lake and Painesville.

{¶34} Sanders said that appellant also provided the Carlson checks, which he had also stolen. With those checks they went to the Middlefield area looking for

10

construction-type equipment because appellant knew people who were interested in those items. He said that, in general, appellant kept the Carlson checkbook until they entered each store to make a purchase. Just before entering a store, appellant would give him the checkbook and Wendy Carlson's driver's license. Then, after leaving each store, Sanders would return the checkbook to appellant.

{¶35} Appellant did not present any witnesses denying any aspect of the state's evidence, which was therefore undisputed.

{¶36} Following the presentation of the evidence, the jury returned a verdict, finding appellant guilty of all counts as charged in the indictment.

{¶37} At appellant's sentencing, the trial court noted that appellant has an extensive criminal record. Appellant was adjudicated as a juvenile delinquent on several occasions. For example, in 1988, appellant was found to be delinquent for discharging a gun and attempted theft. In 1989, he was found delinquent for two counts of criminal trespass. In 1990, he was adjudicated for aggravated burglary, grand theft, and complicity to grand theft, and committed to D.Y.S. for one year. In 1992, he was adjudicated for assault. The court noted that appellant had 17 juvenile cases. As an adult, appellant was convicted of two counts of trafficking in drugs in 1994. He was convicted of possession of drug paraphernalia in 1995. For this offense, appellant was sentenced to prison for one year. He was convicted of domestic violence twice in two separate cases in 1996. He was convicted of fleeing and eluding in 1997. He was convicted of passing bad checks in 2003. He was convicted of receiving stolen property in 2004. He was again convicted of possession of drug paraphernalia in 2005. He was convicted of engaging in a pattern of corrupt activity, breaking and entering, and four

11

predicate theft offenses in 2006. For these crimes, appellant was sentenced to three years in prison. After his release, he was convicted of theft in 2010. He was convicted of breaking and entering in 2011. Also in 2011, he was convicted of receiving stolen property in three separate cases. In 2011, appellant was sentenced to prison twice for a total of 14 months. The trial court noted that appellant has had 15 criminal cases as an adult.

{¶38} The court sentenced appellant to six years in prison for engaging in a pattern of corrupt activity (Count 1) and seven months for the theft of blank checks (Count 2), the two terms to be served consecutively. The court sentenced appellant to 120 days each for theft as charged in Count 3 (Lake Erie Lawn and Garden), Count 4 (Lake Erie Lawn and Garden), Count 5 (Airgas), and Count 6 (First Quality Power Tools), each term to be served concurrently to each other and concurrently to the other prison terms. The court sentenced appellant to seven months for theft as charged in Count 7 (Hemley Tools), which was to be served consecutively to the other sentences. The court also sentenced appellant to eight months each for theft as charged in Counts 8 and 9. These terms were to be served concurrently to each other, but consecutively as one eight-month sentence to the other prison terms. Finally, the court sentenced appellant to eight months for theft as charged in Count 10 (Haueter's Lawn and Sport Center), which was to be served consecutively to the other prison terms. Appellant's aggregate sentence was eight and one-half years in prison. The trial court also sentenced appellant in a second pending criminal case, in which he pled guilty to one count of possession of criminal tools, to six months, which was to be served concurrently to the sentence in the instant case.

12

**{¶39}** Appellant appeals his conviction and sentence, asserting three assignments of error. For his first assigned error, he alleges:

**{¶40}** "The evidence was insufficient to sustain a guilty verdict on count one."

**{¶41}** Sufficiency is a test of adequacy that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. *State v. Boyle*, 11th Dist. Portage Nos. 2004-P-0099, 2004-P-0100 and 2004-P-0101, 2005-Ohio-5493, ¶22. A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle*, 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶25. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14 (Dec. 23, 1994). In reviewing the sufficiency of the evidence, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, *supra.* Circumstantial evidence and direct evidence inherently possess the same probative value. *Id.* at 272.

**{¶42}** R.C. 2923.32(A)(1), Ohio's version of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), provides: "No person * * * associated with * * * any enterprise shall conduct or participate in the affairs of the enterprise through a pattern of corrupt activity * * *."

**{¶43}** Thus, in order for appellant to be convicted of engaging in a pattern of corrupt behavior, the state had the burden of proving that he, while associated with an enterprise, participated in the affairs of the enterprise through a pattern of corrupt activity. *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶96.

**{¶44}** Appellant does not dispute the state proved a pattern of corrupt activity. He argues only that the state failed to present sufficient evidence of an enterprise.

**{¶45}** R.C. 2923.31(C) defines "enterprise" as "any individual * * * or any * * * group of persons associated in fact although not a legal entity." The statute further provides that an enterprise "includes illicit as well as licit enterprises."

**{¶46}** In analyzing the requirements of an enterprise under the analogous federal RICO statute, the United States Supreme Court held in *Boyle v. United States*, 556 U.S. 938, 946 (2009), as follows:

> **{¶47}** From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: [1.] a purpose, [2.] relationships among those associated with the enterprise, and [3.] longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in [*United States v.*] *Turkette*, 452 U.S. 576], an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S., at 583.

**{¶48}** This court followed *Boyle* in *Perry*, *supra*. In *Perry*, the defendant and a male named Ivery broke into five different homes in a one-month period and stole

14

various items of personal property from each. In holding that the state proved the existence of an enterprise, this court stated:

{¶49} Though the statute describes what an enterprise may include, it does not actually define what an enterprise requires. Such an omission has been previously recognized by appellate courts in Ohio. To better understand this statute, the Twelfth Appellate District recently analyzed the definition of "enterprise" and adopted a "streamlined" definition from the federal case of *Boyle*[, *supra*], noting "'an association-in-fact enterprise is simply a continuing unit that functions with a common purpose.'" *State v. Barker*, 12th Dist. Warren No. CA2011-08-088, 2012-Ohio-887, ¶10, quoting *Boyle* at 2245-2246.

{¶50} Based on the evidence adduced at trial involving the various dealings of Ivery and appellant, there is a sufficient basis on which to conclude that the duo engaged in an enterprise which carried out the common purpose to engage in theft. *Perry*, *supra*, at ¶98-99.

{¶51} Applying these principles here, first, appellant and Sanders engaged in an enterprise that carried out a *common purpose* to pass stolen checks to multiple businesses to steal merchandise that could be quickly converted to cash to buy drugs. Second, there were *relationships between those associated with the enterprise*. These relationships were both criminal and personal. The roles of the associates in these crimes were well-defined. Appellant stole the checks and sold much of the merchandise to people he knew who were looking for the specific merchandise he and

15

Sanders stole. Sanders did most of the talking, and, according to him, "manipulated and connived [his] way into convincing people to accept these checks at every stop [they] made." Turcoliveri had the car and drove Sanders and appellant to the stores they decided to hit. Moreover, the associates had personal relationships with each other. Sanders said he has known appellant since high school and he loves him like a brother. Turcoliveri is Sanders' girlfriend. Tingler and Boles are Sanders' nephews. Third, the associates' crimes were committed in a one-month period, *long enough to permit them to pursue the enterprise's purpose.* We also note that *a*ppellant was convicted of nine theft offenses arising from his involvement in this enterprise. Moreover, his accomplice, Sanders, pled guilty to engaging in a pattern of corrupt activity and numerous theft offenses as a result of his involvement in these crimes. Further, Turcoliveri pled guilty to identity fraud, forgery, and theft. We therefore hold the state presented sufficient evidence to establish the existence of an enterprise.

{¶52} Appellant's first assignment of error is overruled.

{¶53} For his second assigned error, appellant contends:

{¶54} "The evidence was insufficient to sustain a guilty verdict on count ten."

{¶55} Appellant argues the evidence was insufficient to convict him of Count 10, the theft of the generator from Haueter's on February 26, 2011, because he was not physically present at the time. Appellant ignores, however, the compelling evidence that demonstrates his active participation in this theft. Turcoliveri testified that on February 23, 2011, she drove Sanders and appellant to Haueter's in Middlefield to buy a generator. Sanders testified that he and appellant planned to purchase the generator that day using a Carlson check. Turcoliveri testified that Sanders and appellant were

16

unable to get one at the Middlefield store so they had the manager call the Haueter's store in Chardon to see if he could get a generator for them. The Chardon store manager said it would be in the store in a few days. Then, on February 26, 2011, Turcoliveri drove Sanders to the Chardon Haueter's where he "bought" the generator using a Carlson check. The state thus presented sufficient evidence that appellant actively participated in stealing the generator from Haueter's.

{¶56} Appellant's second assignment of error is overruled.

{¶57} For his third and final assignment of error, appellant alleges:

{¶58} "The theft charges were allied offenses of similar import with the charge of engaging in a pattern of corrupt activity, and it was plain error not to merge counts two through ten with count one."

{¶59} Appellant argues the trial court committed plain error in not merging the nine predicate theft offenses with engaging in a pattern of corrupt activity. He concedes he failed to raise this issue in the trial court. Therefore, he waived all but plain error. *See e.g. State v. Comen*, 50 Ohio St.3d 206, 211 (1990). Plain error exists when a trial court did not merge a defendant's allied offenses of similar import. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶31.

{¶60} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Supreme Court of Ohio set forth a new analysis for determining whether multiple offenses are allied offenses of similar import. Under the new two-part test, the court considers the defendant's conduct and answers two questions. *Id.* at ¶44. The first question is "whether it is possible to commit one offense and commit the other with the same conduct." *Id.* at ¶48. If it is found that the offenses can be committed by the same

17

conduct, the court must then determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Id.* at ¶49. If the answer to both questions is yes, the offenses are allied offenses of similar import and must be merged. *Id.* at ¶ 50.

**{¶61}** If, however, "the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has a separate animus for each offense, then the offenses will not merge." *Id.* at ¶51.

**{¶62}** Appellant's contention that the predicate offenses should be merged with his RICO violation, has been consistently rejected by Ohio courts, both before and after *Johnson*. In *State v. Moulton*, 8th Dist. Cuyahoga No. 93726, 2010-Ohio-4484, a pre-*Johnson* case, the Eighth District noted that "state and federal courts around the country have uniformly found that a RICO violation is a discrete offense that can be prosecuted and punished separately from its underlying predicate offenses." *Id.* at ¶38.

**{¶63}** Ohio courts have similarly rejected this argument post-*Johnson*. *See State v. LaSalla*, 8th Dist. Cuyahoga No. 99424, 2013-Ohio-4596 (theft offenses not allied offenses with the RICO offense); *State v. Montoya*, 12th Dist. Clermont No. CA2012-02-015, 2013-Ohio-3312 (drug possession and trafficking not allied offenses with the RICO offense); *State v. Thomas*, 3d Dist. Allen Nos. 1-11-25 and 1-11-26, 2012-Ohio-5577 (trafficking in drugs did not merge with the RICO offense); *State v. Dodson*, 12th Dist. Butler No. CA2010-08-191, 2011-Ohio-6222, ¶67, *discretionary appeal not allowed at* 131 Ohio St.3d 1486, 2012-Ohio-1143 (trafficking in marijuana did not merge with the RICO offense as RICO requires an additional state of mind to form an enterprise); *State v. Miranda*, 10th Dist. Franklin No. 11AP-788, 2012-Ohio-3971, ¶12, *affirmed at* 2014-

18

Ohio-451 (trafficking in marijuana predicate offense did not merge with the RICO offense).

{¶64} This court also held that predicate theft and uttering offenses do not merge with a RICO violation in *State v. Dudas*, 11th Dist. Lake Nos. 2008-L-109, 2008-L-110, 2009-Ohio-1001, ¶45, 49. This court stated:

{¶65} A violation of R.C. 2923.32 requires more than just the commission of multiple designated acts of corrupt activity. R.C. 2923.32 requires * * * association with an enterprise and participation in the affairs of the enterprise through a pattern of corrupt activity. Such pattern must include both a relationship and continuous activity, as well as proof of the existence of an enterprise. Thus, the conduct required to commit a RICO violation is independent of the conduct required to commit designated acts of corrupt activity.

{¶66} Further, R.C. 2923.32 was enacted to criminalize the "pattern of criminal activity," and not the underlying predicate acts. Its application depends on the existence of a "pattern of criminal activity" that violates an independent criminal statute. * * *. *Id.* at ¶46-47.

{¶67} Ohio courts have relied on legislative intent in finding that a RICO offense did not merge with the predicate offense. *LaSalla*, *supra*, at ¶28. R.C. 2923.32 was intended to provide enhanced sanctions to deal with the unlawful activities of those engaged in organized crime. *Id.*, citing *State v. Thrower*, 62 Ohio App.3d 359, 377 (9th Dist.1989). Further, the Tenth District in *Miranda*, *supra*, stated: "[T]he General

19

Assembly intended to permit separate punishments for engaging in a pattern of corrupt activity and the underlying predicate crimes." *Id.* at ¶ 12. *Accord Dudas*, *supra*.

**{¶68}** As the Eighth District stated in *LaSalla*, *supra*, "The RICO statute is intended to separately criminalize the use of an enterprise for the purpose of systematically committing illicit activities. The purpose of the statute would be frustrated by merging the RICO offense with the predicate offense." *Id.* at ¶28.

**{¶69}** Thus, the Third, Eighth, Tenth, Eleventh, and Twelfth Districts have held that predicate offenses are not allied offenses with a RICO offense. Significantly, appellant has failed to cite even one case holding that predicate offenses must be merged with a RICO violation.

**{¶70}** We therefore hold the trial court did not commit plain error in not merging the predicate theft offenses with appellant's RICO violation.

**{¶71}** Appellant's third assignment of error is overruled.

**{¶72}** For the reasons stated in the opinion of this court, appellant's assignments of error lack merit and are overruled. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

TIMOTHY P. CANNON, P.J.,

DIANE V. GRENDELL, J.,

concur.