# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30525

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

BYRON JONES, Also Known as Big Baby Jones;
DELOYD JONES, Also Known as Puggy Jones;
SIDNEY PATTERSON, Also Known as Duda Man Patterson,

Defendants–Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before SMITH, OWEN, and HIGGINSON, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Byron Jones ("Byron"), Deloyd Jones ("Deloyd"), and Sidney Patterson appeal their convictions of numerous felonies related to their membership in a group called Ride or Die ("ROD"). They challenge the sufficiency of the evidence and the admission of certain evidence, the refusal to adopt proposed jury instructions, and application of the sentencing guidelines. We affirm, except

No. 16-30525

with respect to Counts 9, 10, 13, and 14, as to which we reverse, and we remand for resentencing.

## I.

The government claimed that ROD, which operated in New Orleans's Eighth Ward, was a criminal gang whose members conspired to distribute crack cocaine, possess firearms, and commit a variety of violent crimes for the group's benefit. The appellants and nine other alleged members of ROD were charged with murder, assault, racketeering, drug trafficking, using a firearm in the commission of a violent crime, and related offenses.[1] All except the appellants pleaded guilty. The government accused the appellants of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Federal Gun Control Act, the Federal Controlled Substances Act, and the Violent Crimes in Aid of Racketeering Act ("VICAR"). At trial, the prosecution focused on six incidents: the February 24, 2010, murder of Travis Arnold and shooting of Isaac Rowel; the April 29, 2010, shooting of Ernest Augustine; the November 9, 2010, murder of Rodney Coleman; the January 6, 2011, shooting of Marquisa Coleman and Jimmy Joseph; the January 17, 2011, murder of Devin Hutton, shooting of Victor Guy, and assault of Krystal Collier; and the January 18, 2011, murder of Corey Blue.

The jury convicted all three appellants on the RICO, drug-trafficking conspiracy, and gun-conspiracy counts; convicted Byron and acquitted Patterson on counts relating to the Arnold murder; convicted Byron on counts relating to the Augustine shooting and determined that the gun was discharged; acquitted Deloyd on counts relating to the Rodney Coleman murder; convicted

---

[1] The indictment lists thirty-three overt acts in which one or more of the appellants allegedly participated.

No. 16-30525

Deloyd on counts relating to the shooting of Marquisa Coleman and Joseph and determined that the gun was discharged; convicted Deloyd on counts relating to the Hutton murder and the assaults of Guy and Collier; and convicted Deloyd and Patterson on counts relating to the Blue murder. The district court sentenced all three appellants to life imprisonment and consecutive sentences of 120 months' and 300 months' imprisonment for using firearms in furtherance of their crimes. *See* 18 U.S.C. § 924(c).

## II.

On the sufficiency challenge, "we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 855 (5th Cir. 1998)). Because appellants moved for acquittal at trial, our review is *de novo* but "highly deferential to the verdict." *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014) (quoting *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014)).

Count 1 (RICO Conspiracy)

The evidence is sufficient on the RICO convictions. Conspiracy to violate any of RICO's substantive provisions is a crime. *See* 18 U.S.C. § 1962(d). "To prove a RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *Posada-Rios*, 158 F.3d at 857–58. "The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances." *Id.* at 857. A co-conspirator needs only to have known of, and agreed to, the overall objective of the RICO offense.

3

No. 16-30525

*Salinas v. United States*, 522 U.S. 52, 61−66 (1997).

The substantive RICO provision prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." § 1962(c). The government must prove that (1) such an enterprise existed; (2) the activities of the enterprise affected interstate or foreign commerce; (3) the defendant was "employed by" or "associated with" the enterprise; (4) the defendant participated in the conduct of the enterprise's affairs; and (5) the participation was through "a pattern of racketeering activity." *Posada-Rios*, 158 F.3d at 855.

The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). To establish the existence of an enterprise, the government must present "evidence of an ongoing organization, formal or informal, and . . . that the various associates function as a continuing unit." *Id.* The term "enterprise" encompasses "an amoeba-like infra-structure that controls a secret criminal network" as well as "a duly formed corporation that elects officers and holds annual meetings." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978). A jury may "infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence." *Id.*

The government claims that ROD was an informal, association-in-fact enterprise. "[T]he very concept of an association in fact is expansive," but it "must have at least three structural features: a purpose, relationships among

4

those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 944−46 (2009).

The government points to the various crimes that appellants allegedly committed as evidence of a "pattern of racketeering activity." The term "racketeering activity" encompasses a wide range of state and federal offenses, including murder, robbery, extortion, and drug-dealing. § 1961(1). A "pattern of racketeering activity" exists where an offender has committed at least two acts of racketeering activity within ten years. § 1961(5).

Appellants challenge this charge on three grounds. First, they claim that ROD was not an enterprise. Patterson describes ROD members as "lone wol[ves]" and cites testimony denying that ROD members shared money, drugs, or guns.[2] One former member testified that "Ride or Die is just a bunch of young men who really like hanging out."

That is inaccurate. ROD had a clear purpose—selling drugs and protecting those drug sales and the group's members—and its members were associated with one another. Members used a house on Mandeville Street to store guns and drugs and to prepare and package the drugs for resale, working in shifts. The owner of the house testified that on at least one occasion, members pooled their money to buy crack for resale. A former member testified that members sold drugs at specific locations, that only members could sell drugs in certain territories, and that members stashed guns for other members' use. Members committed a large number of violent crimes alongside other members.[3] The evidence, which included hours of testimony from law-

---

[2] Byron concedes that "there may have been pooling of resources, mutual access to firearms, or protection of turf."

[3] Appellants do not dispute that ROD had sufficient longevity to qualify as an

enforcement officers and former members, was sufficient for the jury to conclude that ROD fell within RICO's expansive definition of "enterprise."

Second, appellants claim that several of the criminal acts they committed during ROD's existence were unrelated to ROD and therefore were not part of a pattern of racketeering activity. But appellants' theories on this point are conclusional. Byron notes only that "[t]he government . . . failed to establish through any competent evidence that [Byron's criminal convictions] and [the government's] allegations are related to any common purpose other than establishing the criminality of Byron Jones." Patterson contends that one of the traffic stops mentioned in the indictment was unrelated to ROD. No appellant casts serious doubt on the government's claim that appellants committed at least two predicate acts in furtherance of a RICO conspiracy. The government presented sufficient evidence that appellants engaged in a pattern of racketeering activity.

Finally, Byron suggests that even if the other appellants committed crimes on behalf of ROD, he did not. He notes that to establish that ROD members had a common purpose, the government relied heavily on testimony about the house on Mandeville Street, which ROD controlled while Byron was in prison. But the government also presented evidence that ROD behaved like a gang long before it took over that house (at which time Byron was already an ROD member): controlling territory, sharing resources, and engaging in violence to promote the organization's interests.

Count 2 (Drug Distribution Conspiracy)

Appellants challenge their convictions of conspiring to distribute controlled substances. To establish a drug-trafficking conspiracy, the government

---

association in fact.

6

must show "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Nieto*, 721 F.3d 357, 367 (5th Cir. 2013). The government may prove an agreement by demonstrating the coconspirators' concert of action with respect to distribution of drugs.[4]

The government presented sufficient evidence to establish that appellants participated in a drug-trafficking conspiracy. Witnesses testified that Byron and Patterson packaged drugs, sold drugs, and committed violent crimes to defend and expand ROD's drug-selling territory. The government presented less evidence of Byron's handling of drugs but showed that he committed crimes to support the conspiracy. For example, Byron's alleged murder of Travis Arnold allowed ROD to sell drugs in an area of Mandeville Street that it could not previously reach.

Count 3 (Conspiracy to Possess Firearms)

Appellants were convicted of conspiracy to possess firearms in furtherance of either the RICO conspiracy charged in Count 1, the drug-trafficking conspiracy charged in Count 2, or both, in violation of 18 U.S.C. § 924(o). Patterson claims that he used guns for "personal protection" and notes that none of the government's witnesses testified that the witness saw Patterson using a firearm in furtherance of a conspiracy. Similarly, Byron claims that although he had guns, he did not use them in furtherance of a conspiracy.

To the contrary, there was plenty of evidence tying appellants' firearm use to the charged conspiracies. For example, Patterson used a firearm in

---

[4] *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007); *see also United States v. Inocencio*, 40 F.3d 716, 725 (5th Cir. 1994) ("A conspiracy agreement may be tacit, and the trier of fact may infer an agreement from circumstantial evidence.").

connection with the shooting of Joseph and Coleman and that Byron used a firearm in the murder of Travis Arnold. Sufficient evidence was presented to convict appellants of both crimes, as discussed below. More generally, guns were ubiquitous at ROD gatherings. A former member of ROD testified that ROD had so many guns in the Eighth Ward that "[a]nywhere you went there was a gun around." Another former member testified that all male ROD members used guns, which were necessary to the RICO and drug-trafficking conspiracies. Without them, ROD would not have been able to defend and expand its territory. The evidence supports the convictions on Count 3.

Counts 5–8 (Arnold/Rowel Shooting)

In February 2010, someone in a car shot Arnold in the head and Isaac Rowel in the shoulder while Arnold and Rowel were at a stoplight. Arnold died from his injuries; Rowel survived. Rowel eventually identified Byron as the driver and said that, just before the shots, he saw Byron "rocking back and forth" and looking in his direction. Rowel also saw another person in Byron's car whom he was unable to identify. Arnold's nephew, Darryl Arnold, testified that Byron told him before the shooting that he was "going to kill Travis and make you cry." Then, after the shooting, Byron told Darryl that Byron was "the new [B]east," a reference to Travis's nickname.

On Count 5, the jury convicted Byron of "murder in aid of racketeering"— that is, that he had murdered Arnold to benefit ROD, in violation of Louisiana's second-degree-murder statute, LA. REV. STAT. ANN. §§ 14:30.1(A)(1) and 24, and the federal VICAR statute, 18 U.S.C. § 1959(a)(1) and (2).[5] Louisiana

---

[5] Section 1959(a) provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . murders . . . any individual in violation of the laws of any State or the United States . . . shall be punished. . . ."

defines second-degree murder as killing with the specific intent to kill or inflict great bodily harm. *See* LA. REV. STAT. ANN. § 14:30.1(A)(1). Louisiana classifies as principals "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." § 14:24. To establish that a defendant has violated VICAR, the government must show that (1) an enterprise existed; (2) the enterprise engaged in, or its activities affected, interstate commerce; (3) it was engaged in racketeering activity; (4) the defendant committed violent crimes; and (5) the defendant committed the violent crimes to gain entrance to, or maintain or increase his position in, the enterprise.[6]

On Count 6, the jury convicted Byron of causing death through the use of a firearm in violation of 18 U.S.C. § 924(j), which imposes additional penalties on defendants who use a firearm to kill during the commission of a violent or drug-trafficking crime. On Count 7, the jury convicted Byron of assault with a dangerous weapon in aid of racketeering, in violation of Louisiana's aggravated-assault statute[7] and VICAR. On Count 8, the jury convicted Byron of using a firearm in relation to a violent crime or a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). To establish a violation of § 924(c)(1)(A), the government must show that the defendant (1) committed a violent crime or trafficked drugs and (2) knowingly used or carried firearms during and in relation to that crime.[8] The government claims that Byron discharged a gun in furtherance of either the RICO conspiracy charged in Count 1 or the drug

---

[6] *See* PATTERN CRIM. JURY INSTR. 5TH CIR. 2.78 (2015).

[7] *See* LA. REV. STAT. ANN. § 14:37(A), defining aggravated assault as "an assault committed with a dangerous weapon."

[8] *See* PATTERN CRIM. JURY INSTR. 5TH CIR. 2.44 (2015).

conspiracy charged in Count 2.

Byron challenges those convictions on the ground of insufficient evidence tying the alleged murder and assault to his supposed participation in a racketeering enterprise. To the contrary, there is evidence, described above (including Byron's reference to Travis's nickname "the Beast"), that Byron murdered Arnold and assaulted Rowel in furtherance of the charged RICO and drug conspiracies.[9]

Counts 9–10 (Augustine Shooting)

Ernest Augustine was shot five times while sitting in his truck. He survived. Though he did not see who shot him, someone else did: Terrance Paul testified that he was standing on his mother's porch, across the street from Augustine's truck, when he saw Byron approach the truck and begin shooting. A firearms expert testified that the spent bullets and casings were fired from the gun that Byron discarded during a police stop two weeks after the shooting. The jury convicted Byron of assault with a dangerous weapon in aid of racketeering, in violation of Louisiana's aggravated-assault statute and VICAR (Count 9), and of discharging a firearm during and in relation to a crime of violence or a drug-trafficking crime, in violation of § 924(c)(1)(A) (Count 10).

Byron claims that the government failed to prove that he was the shooter or that the shooting was related to his membership in ROD. Although there is enough evidence for a jury to find, beyond a reasonable doubt, that Byron shot Augustine, the evidence is insufficient as to how the shooting relates to Byron's membership in ROD or the charged conspiracies. Accordingly, we reverse Byron's convictions on Counts 9 and 10.

---

[9] The government charged Byron and Patterson under Counts 5, 6, 7, and 8, but the jury found only Byron guilty.

Counts 13–14 (Rodney Coleman Murder)

On January 6, 2011, Marquisa Coleman confronted Deloyd inside a store. They got into a heated argument over whether Deloyd had murdered Coleman's son, Rodney. Coleman, along with Jimmy Joseph, left the store soon thereafter and began walking home. When they were about a block away from the store, they noticed that two people were following them. Then, someone emerged from behind a truck and started shooting. Coleman got shot multiple times and was badly injured; a bullet grazed Joseph's head, but he was not seriously hurt.

Joseph implicated Patterson and Deloyd in the shooting. He testified that he thought Patterson was the shooter because the shooter had a deformed arm like Patterson's. Joseph described Deloyd as "a director of some sort" and testified that as he was lying on the ground after being shot, he heard Deloyd say, "No, don't shoot him. Shoot the bitch."

There were inconsistencies in both victims' testimonies. Joseph was initially unable to identify the shooter but later told police that Patterson had shot him, something that he repeated in his testimony. But at trial, he said that he could not identify the shooter, adding that he "d[id]n't even want to be here today." Coleman, who also testified that Patterson was the shooter, initially told the police that Deloyd had been the shooter. In connection with the shooting, the jury convicted Patterson and Deloyd of assault with a dangerous weapon in aid of racketeering, in violation of Louisiana's aggravated-assault statute and VICAR (Count 13), and of discharging a firearm during and in relation to a crime of violence or a drug-trafficking crime, in violation of § 924(c)(1)(A) (Count 14).

The government presented sufficient evidence that Deloyd and Patterson committed the shooting. But, as with Counts 9 and 10, there is insufficient

proof regarding the relationship between the shooting and ROD or the charged conspiracies and thus a failure of proof on how the shooting was in "aid of racketeering." We reverse the convictions on Counts 13 and 14.

Counts 15–18 (Marquisa Coleman and Jimmy Joseph Shooting)

On January 17, 2011, Victor Guy was walking with a friend when he was approached by three assailants who were wearing scarves over their mouths. One put a gun to Guy's head, walked him to Devin Hutton's apartment, and told him to knock on the door. After Hutton opened the door, two of the assailants rushed into Hutton's apartment while the third stayed with Guy. Guy heard one of the assailants yell, "Where's it at? Where is the money? Where's the drugs?" Then Guy heard a gunshot and ran away. Guy was shot eight times while trying to escape.

The assailants also put a gun to Krystal Collier's head after she stumbled into the middle of the altercation. She identified Deloyd as the assailant who put the gun to Guy's head, stayed behind while the other two went into Hutton's apartment, and shot Guy as he was trying to escape. Though Collier did not see what happened in the apartment, she did hear one of the men say, "Fuck it. Just kill him. Tell Pooky the riders came through." One of Hutton's friends, who was in his apartment when the assailants burst in, confirmed that two men with guns came into the apartment and shot Hutton, who died of his wounds. The jury convicted Deloyd of murder in aid of racketeering, in violation of Louisiana's second-degree-murder statute and VICAR (Count 15); causing death through the use of a firearm, in violation of § 924(j) (Count 16); assault with a dangerous weapon in aid of racketeering, in violation of Louisiana's aggravated-assault statute and VICAR (Count 17); and discharging a firearm during and in relation to a crime of violence or a drug-trafficking crime, in violation of § 924(c)(1)(A) (Count 18).

Deloyd inaccurately claims that the government failed to establish a connection between the alleged crimes and ROD. It is obvious that the murder had something to do with ROD's drug operations. After all, according to Collier's testimony, the assailants asked Hutton about drugs and money before shooting him on behalf of "the riders."

Counts 19–20 (Blue Murder)

On January 18, 2011, Corey Blue was murdered outside his house. His cousin, Kevin Johnson, testified that he was at Blue's house that night. According to Johnson, Blue went outside after receiving a phone call. Before long, Johnson heard gunshots and ran to the front door. As Johnson was crossing the threshold, Patterson shot in his direction, though Johnson was not hit. Johnson indicated that Patterson was accompanied by at least one other man, who, along with Patterson, got into a car and drove away.

Jamal Holmes testified that while he and Patterson were sharing a cell at the parish jail, Patterson admitted to "put[ting] the work in on Corey Blue" along with Deloyd and someone named Shelly. Holmes also testified that when he told Deloyd, "Y'all shook up the Eighth Ward when y'all killed Blue," Deloyd responded, "Yeah, I punished him."

The owner of the house on Mandeville Street testified that the night Blue was killed, Deloyd, Patterson, and some other ROD members were at the house packaging drugs when they realized that their package was short. Deloyd, Patterson, and an unidentified woman left for thirty minutes. When they returned, Deloyd said that he had just "punished" someone. The owner, who later heard from other ROD members that Deloyd and Patterson had killed Blue, noticed that after they returned, Deloyd and Patterson put on new T-shirts, and another ROD member cleaned their guns with bleach. The jury convicted Patterson and Deloyd of murder in aid of racketeering, in violation

of Louisiana's second-degree-murder statute and VICAR (Count 19), and of causing death through the use of a firearm, in violation of § 924(j) (Count 20).

Appellants question the reliability of the government's witnesses and claim that the prosecution has not shown that the murder was related to appellants' membership in ROD.  The evidence, however, including the evidence that Deloyd "punished" Blue in relation to ROD's drug trade, was enough for a jury reasonably to conclude that Deloyd and Patterson murdered Blue in furtherance of the RICO and/or drug conspiracies.

III.

A.

Appellants objected to the introduction of certain recorded phone calls made by inmates and authenticated by third parties.  Government witnesses identified all three appellants as among the speakers.  The parties stipulated that the recordings were of authentic Orleans Parish Prison inmate calls.  But appellants claim that the speakers were not properly identified, so the district court erred by admitting the recordings.  In addition, Patterson claims that some of the recordings included hearsay or were otherwise inadmissible.

We review evidentiary determinations, including the identification of recorded speakers, for abuse of discretion.  *See United States v. Garza*, 591 F. App'x 259, 260 (5th Cir. 2015) (citing *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011)).  "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005) (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

When a recording is at issue, a "witness's familiarity with the voice sought to be identified, whether the familiarity developed before or after the

time of the recording, is sufficient to ensure reliable voice identification." *United States v. Biggins*, 551 F.2d 64, 68 (5th Cir. 1977). A witness does not need to have a close relationship with the speaker; "some familiarity" is sufficient. *United States v. Thomas*, 690 F.3d 358, 372 (5th Cir. 2012) (quoting *United States v. Cuesta*, 597 F.2d 903, 915 (5th Cir. 1979)). A law enforcement agent may identify a voice with which he is familiar. *United States v. Norman*, 415 F.3d 466, 472 (5th Cir. 2005).

The government relied on three witnesses to identify the speakers in the recorded jail calls: former ROD members Andrealie Lewis and Erick Garrison, and ATF Agent Jennifer Doreck. Lewis and Garrison explained that they recognized many of the voices in the recordings from personal experience, though they were unable to identify every voice. Lewis also testified that she knew that some of the calls were from Deloyd because the jail phone system identified him as the caller. Though Doreck was not personally familiar with the speakers, she was able to identify their voices based on the folder numbers assigned to the inmates making the calls, the phone numbers of call recipients, the speakers' self-identification or identification of other speakers, discussions with government cooperators, and her knowledge of relevant events. She also familiarized herself with appellants' voices by listening to hundreds of their phones calls; some she listened to repeatedly.

Lewis, Garrison, and Doreck had foundation to identify the speakers in the recordings. The law requires only that an identifying witness has some familiarity with a speaker's voice, *Thomas*, 690 F.3d at 372, something that each of the identifying witnesses had. Lewis and Garrison knew the speakers they identified personally. Doreck familiarized herself with the voices, as explained above. Patterson observes that the court denied his request to require Doreck to identify each appellant's voice from a blind recording. But he does

15

not cite any caselaw suggesting that the denial of a request to traverse a witness is an abuse of discretion.

Patterson's other theories relating to the decision to admit the recordings are no more convincing. He claims that some of his conversations were inadmissible hearsay. But his statements during these calls were admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(A), and the other call participants' statements were admissible to provide context. *See United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997).

Patterson claims that a conversation he had with an associate, which the court admitted, was irrelevant because it involved his attendance at an anger-management class. In the conversation, Patterson says that he would be risking his life by going to an anger-management class and that, before he went to prison, he "had to stash" something. The conversation is hard to follow but sheds some light on Patterson's criminal activities and is therefore relevant.

Finally, Patterson claims that the court erred by allowing Doreck to testify about the content of some of the recordings, which allowed her "to get in additional testimony that prejudiced the Defendants and imply they were admitting to crimes for which they were on trial." But that testimony was elicited by defense counsel during cross-examination. The district court did not plainly err by admitting it.

## B.

The government introduced evidence of appellants' convictions, including some that occurred before they turned eighteen. The government claimed that the convictions were admissible as evidence that appellants had engaged in racketeering activity.[10] The government also called a police officer to testify

[10] *See United States v. Erwin*, 793 F.2d 656, 670 (5th Cir. 1986) ("In a subsequent trial

about a traffic stop at which the officer found crack cocaine on Patterson when Patterson was a juvenile; a second officer to testify that she found a firearm on Byron during a traffic stop when Byron was a juvenile; and a third officer to testify about another traffic stop involving a then-underage member of ROD (though not one of the appellants).  Patterson claims that the court should have instructed the jury that it could not consider events that took place when appellants were minors.

Both sides agree that this issue is subject to plain-error review.  "To demonstrate plain error, an appellant must show (1) a forfeited error, (2) that is clear or obvious, and (3) that affects the appellant's substantial rights." *United States v. Moreno*, 857 F.3d 723, 727 (5th Cir. 2017) (brackets and internal quotation marks omitted).  Even then, the court may correct the error "only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

The court did not plainly error by admitting the evidence of juvenile misconduct, because any error was not clear or obvious, meaning settled by "the time of appellate review."  *See Henderson v. United States*, 568 U.S. 266, 268 (2013).  As Patterson acknowledges, we have never determined whether a court is required to instruct the jury to disregard evidence of a defendant's juvenile misconduct.  In *United States v. Harris*, 740 F.3d 956, 966 (5th Cir. 2014), we declined to settle the issue and noted that the other circuits are split.  To the extent any error occurred, it could not have been "plain."  *Id.*

---

for RICO, the government may count, as a predicate offense, a defendant's prior conviction for an offense falling within the definition of 'racketeering activity.'").

No. 16-30525

C.

In the middle of trial, appellants were brought to a holding cell in the courthouse. Witnesses Sean Watts and Darryl Arnold were in a nearby holding cell; both had already testified. According to the government, Deloyd shot Watts in 2009, but in his testimony, Watts said that he could not identify his shooter. Arnold proved more helpful to the government's case, going so far as to accuse Patterson and Byron of killing his uncle, Travis Arnold.

Meanwhile, according to Jamal Holmes, who was sitting in a cell in another room, appellants soon began talking to Watts and Arnold. Holmes says that he heard the conversation through air vents and recognized Deloyd's and Patterson's voices. Holmes says that appellants praised Watts and criticized Arnold. Allegedly, Deloyd told Watts, "[Y]ou kept it real" and "God bless you" and Watts responded, 'I ain't going to help the government sink you. I ain't helping them sink y'all boys." Then, according to Holmes, appellants repeatedly called Arnold a "rat" and accused him of not "keep[ing] it real." Apparently, other witnesses who had not yet testified were nearby and could hear appellants' comments. The government claims that the comments to Arnold were threats meant to intimidate Arnold and the other witnesses.

The government sought to introduce Holmes's testimony on the grounds that the statements were relevant, highly probative, and indicative of appellants' knowledge, intent, and consciousness of guilt. In admitting the testimony over appellants' objections, the district court did not abuse its discretion by admitting the testimony.

Although we review evidentiary determinations for abuse of discretion, a heightened standard applies where, as here, the evidence is admitted under Federal Rule of Evidence 404(b). *United States v. Wallace*, 759 F.3d 486, 493 (5th Cir. 2014). Under Rule 404(b), evidence relating to a defendant's alleged

18

prior bad act is not admissible to show that he has bad character but is admissible for other purposes.  Evidence of a prior bad act is admissible if (1) it "is relevant to an issue other than the defendant's character" and (2) its probative value "is not substantially outweighed by its undue prejudice" and admitting the evidence is otherwise consistent with Federal Rule of Evidence 403.  *United States v. Beechum*, 582 F.3d 898, 911 (5th Cir. 1978) (en banc).

Appellants contend that the risk of unfair prejudice from Holmes's testimony substantially outweighed whatever probative value it may have had. They claim that the testimony was not very probative because it had no bearing on the underlying charges and occurred two years after the charged crimes, and they note that evidence of threats or intimidation could have colored the jury's view of the appellants.

We disagree.  The alleged statements were probative insofar as they tended to establish appellants' knowledge, intent, and consciousness of guilt. Though the testimony was prejudicial, the court's conclusion that the danger of unfair prejudice did not substantially outweigh the evidence's probative value was reasonable.  Evidence of witness intimidation may be admissible.[11] Moreover, "[i]n reviewing the balancing undertaken by the district court, we give great deference to the court's informed judgment and will reverse only after a clear showing of prejudicial abuse of discretion."  *Rocha*, 916 F.2d at 241.  Appellants have not made such a showing.[12]

---

[11] *See, e.g., United States v. Mosley*, 206 F. App'x 365, 366 (5th Cir. 2006) (per curiam); *United States v. Sandoval*, 1995 WL 337738, at *3 (5th Cir. 1995) (unpublished); *United States v. Rocha*, 916 F.2d 219, 241 (5th Cir. 1990).

[12] At the very least, the testimony was relevant to appellants' consciousness of guilt. *Rocha*, 916 F.2d at 241 ("Evidence of a threat by a defendant respecting a specific adverse witness indicates that the defendant was conscious of the weakness of his case; such evidence creates a compelling inference that the defendant's case lacks merit.").

No. 16-30525

Patterson claims that Holmes's testimony was based on a false premise: that appellants had threatened Darryl Arnold. Though appellants repeatedly called Arnold a "rat," Patterson suggests that those statements were non-threatening. Appellants' statements to Arnold could be understood as innocent criticism rather than as threats. But given that a trial court's assessment of the evidence must be "clearly erroneous" to constitute an abuse of discretion, the district court's characterization of appellants' statements did not amount to an abuse of discretion. *Ragsdale*, 426 F.3d at 774.

Appellants question the factual basis for Holmes's testimony. They note that no other witnesses were able to verify Holmes's version of events, leaving the jury with nothing to go on except Holmes's word. But extrinsic-offense evidence is admissible so long as "there is sufficient evidence for the jury to find that the defendant in fact committed the extrinsic offense." *Beechum*, 582 F.2d at 913. Appellants cite no cases suggesting that a witness's testimony about an extrinsic offense is insufficient to establish that the offense occurred.

D.

In February 2011, Byron pleaded guilty to a state charge of second-degree murder, as an accessory after the fact, in connection with the killing of Travis Arnold. Federal prosecutors then charged Byron as a principal in the murder of Arnold (Count 5) and the assault of Rowel (Count 7). Byron requested a jury instruction explaining the meaning of "accessory after the fact" or "parties to a crime" to ensure that the jurors did not take his state court, accessory-after-the-fact guilty plea as evidence of his principal liability. The court did not provide such an instruction, and the jury convicted Byron on both counts.

Byron says that the lack of a proper instruction left jurors confused about the mental state necessary for a conviction. For support, he points to the jury's

No. 16-30525

multiple requests for clarification.  He cites no caselaw.

In denying Byron's motion for new trial, the court conceded that its failure to give the "accessory after the fact" instruction was error but asserted that any error was harmless because attorneys on both sides "repeatedly explained to the jury the distinction between Byron's state-court, accessory-after-the-fact guilty plea and the fact that Byron was charged with being a principal under Louisiana law in the federal crimes for which he was on trial."  Byron claims that the attorneys' comments during trial did not cure the prejudice created by the improper instruction.

In general, we review a district court's refusal to provide a requested instruction for abuse of discretion.  *See United States v. Sheridan*, 838 F.3d 671, 672 (5th Cir. 2016).  We consider whether the requested instruction "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."  *Id.* at 673 (quoting *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005)).  We "may reverse only if the defendant was improperly denied the chance to convey his case to the jury."  *United States v. Hunt*, 794 F.2d 1095, 1097 (5th Cir. 1986).

The government concedes that Byron's requested "accessory after the fact" instruction was "a correct statement of Louisiana law and was not covered by the Court's instructions to the jury."  The question is whether the refusal to give it "seriously impair[ed]" Byron's ability to present a defense to Counts 5 and 7.

It did not.  At trial, both sides discussed, at some length, the distinction between an "accessory after the fact" and a "principal," with both referencing that distinction in their closing arguments.  As the district court found, the

21

jury was "well aware of the significance and meaning of Byron's guilty plea to that offense in state court and how being an accessory after the fact is different from being a principal."

## E.

Deloyd was convicted of the murder of Devin Hutton (Count 15) and the murder of Corey Blue (Count 19).[13]  Both convictions are for "murder in aid of racketeering," which means Deloyd was convicted under state as well as federal law: Louisiana's second-degree murder statute[14] and federal criminal statutes, including 18 U.S.C. § 924(j), which imposes harsh penalties on offenders convicted of committing murder with a firearm during the course of a RICO or drug-trafficking conspiracy.  The Presentence Report ("PSR") calculated Deloyd's sentence in reference to the first-degree-murder guideline in U.S. Sentencing Guidelines ("U.S.S.G.") § 2A1.1.  The district court adopted the PSR's calculations.

Deloyd claims that the court instead should have applied Section 2A1.2, which would have resulted in a shorter sentence.  He notes that the guidelines provide that sentences for § 924(j) convictions should be calculated under either Section 2A1.1 (for first-degree murder) or Section 2A1.2 (for second-degree murder).  *See* U.S.S.G. App. A (Statutory Index).  Neither the PSR nor the court explained why it chose Section 2A1.1, not Section 2A1.2.  Because Deloyd did not raise the issue in the district court, we engage in plain-error review.  *Puckett*, 556 U.S. at 135.

The district court correctly applied the first-degree-murder guideline. Although Deloyd was convicted of second-degree murder under Louisiana law,

---

[13] Patterson was also convicted of murdering Blue.

[14] *See* LA. REV. STAT. ANN. § 14:30.1(A)(1).

22

"first degree murder is the federal crime most analogous to the Louisiana second degree murder statute." *United States v. Tolliver*, 61 F.3d 1189, 1221 (5th Cir. 1995), *vacated on other grounds sub nom. Moore v. United States*, 519 U.S. 802 (1996). Federal law classifies a broad range of murders as "first degree," including "any . . . kind of willful, deliberate, malicious, and pre-meditated killing." 18 U.S.C. § 1111. In contrast, Louisiana's first-degree-murder statute applies only to certain facts. For example, it applies to an offender who has committed felony murder, murdered a police officer, fire-fighter, young child, or elderly person, or murdered multiple persons. *See* LA. REV. STAT. ANN. § 14:30.

Louisiana's second-degree-murder statute is much broader. It applies when an offender has killed a person and had the specific intent to kill or inflict great bodily harm. *Id.* § 14:30.1(A)(1). This encompasses murders that, under federal law, are classified as "first degree." Thus, it was not a clear or obvious error to apply the first-degree murder guideline.

For the reasons stated, the judgment is AFFIRMED except with respect to the sufficiency of evidence as to Counts 9, 10, 13, and 14, on which we REVERSE and direct a judgment of acquittal. This matter is REMANDED for resentencing as appropriate.